**Ex parte Willie Mack MODDEN, Applicant.**

**No. 74715.**

Court of Criminal Appeals of Texas.

April 21, 2004.

---

Gregory W. Wiercioch, Austin, for Appellant.

Clyde Herrington, Asst. DA, Lufkin, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

PRICE, J., delivered the opinion of the Court, in which MEYERS, WOMACK, JOHNSON, HOLCOMB, and COCHRAN, JJ., joined.

In his subsequent application for a writ of habeas corpus, the applicant claimed that he is mentally retarded. We found that the applicant had met the requirements of Code of Criminal Procedure Article 11.071, Section 5, and we remanded to the trial court for findings of fact and conclusions of law. The trial court found that the applicant is retarded. Because the record supports the trial court's findings, we grant relief.

## I. Procedural History

The applicant was convicted of capital murder and sentenced to death in 1985. On direct appeal, the conviction was affirmed.[1] In his initial application for habe-

1. *Modden v. State,* 721 S.W.2d 859 (Tex.Crim. App.1986).

as corpus relief, we reversed the conviction for *Penry* error.[2]

The applicant was retried in 1992, and he was once again convicted and sentenced to death. The conviction and sentence were affirmed on appeal.[3] We denied relief in the applicant's initial writ application for this conviction.[4] He filed this subsequent writ application after the United States Supreme Court began to consider, in *Atkins v. Virginia*, whether the execution of mentally retarded people violates the Eighth Amendment to the Constitution. We dismissed the application. The Supreme Court granted a stay of execution, and nine days later, it delivered the opinion in *Atkins*, in which it held that executing the mentally retarded violates the Eighth Amendment.[5] Later, the Supreme Court granted the applicant's petition for a writ of certiorari, vacated our prior decision dismissing his application, and remanded in light of its decision in *Atkins*.[6] We remanded the case to the trial court to make findings and conclusions about whether the applicant is mentally retarded.

On remand, the State agreed and the trial court found that the applicant is mentally retarded.[7] This finding was based on three reports in which three different mental health experts concluded that the applicant is mentally retarded.

## II. The Law

The United States Supreme Court held in *Atkins* that, under evolving standards of decency, the Eighth Amendment to the United States Constitution prohibits the execution of people who are mentally retarded.[8] The Supreme Court cited with approval the definitions set out by the American Association on Mental Retardation (AAMR)[9] and the American Psychiat-

2. *Ex parte Modden*, No. 71,312 (Tex.Crim. App. delivered Feb. 12, 1992) (not designated for publication); *see Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that jurors that are considering the death penalty must have a vehicle to give effect to their reasoned moral response to the defendant's mitigating evidence).

3. *Modden v. State*, No, 71,493 (Tex.Crim.App. delivered June 8, 1994) (not designated for publication).

4. *Ex parte Modden*, No. 11,364–04 (Tex.Crim. App. delivered July 1, 1998) (not designated for publication).

5. *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

6. *Modden v. Texas*, 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 831 (2002).

7. While this case was on remand to the trial court, the State and the applicant made an agreement that, in exchange for not challenging the applicant's claim that he is mentally retarded, the applicant would plead guilty to five offenses: aggravated assault with a deadly weapon (1976), arson (1985), deadly weapon in a penal institution (1987), deadly weapon in a penal institution (1992), and retaliation (1992). The State agreed to stipulate that the applicant is mentally retarded and present to the trial court agreed proposed findings of fact and conclusions of law on the remand from this Court. And the State filed a motion in the trial court to reform the applicant's sentence. Our holding in this case is not based on the agreement or the motion.

8. *Atkins*, 536 U.S. at 321, 122 S.Ct. 2242.

9. The Supreme Court quoted the AAMR definition of mental retardation in *Atkins*:

Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

ric Association (APA).[10] Basically, mental retardation is defined as (1) significant subaverage general intellectual functioning, (2) concurrent with deficits in adaptive functioning, (3) occurring before age 18.

■ In the absence of legislative direction, we recently adopted those criteria, which are consistent with the definition the legislature set out in Health and Safety Code Section 591.003(13).[11] In *Ex parte Briseno*, we concluded that the criteria in these definitions are subjective, and thus, we set out some additional factors that factfinders may use.[12] We will review the record and apply the criteria we adopted in *Briseno*.

## III. The Record

The first report in the record is from Dr. Joseph P. Kartye, Jr., a psychologist who examined the applicant and testified during the 1985 trial. The trial court admitted this report during the 1985 trial. At the time, the applicant was 36 years old. As part of his examination of the applicant, Kartye administered the Wechsler Adult Intelligence Scale. The applicant achieved a full scale I.Q. score of 64. He also administered the Wide Range Achievement Test. The results showed that the applicant's reading, spelling, and arithmetic abilities were at or below the third-grade level. Kartye concluded that the applicant's intellectual deficits contributed directly to his inability to cope with life's day-to-day demands: the applicant "lacks the cognitive and behavior controls necessary to regulate his behavior." Kartye concluded, in essence, that the appli-

*Id.* at 308 n. 3, 122 S.Ct. 2242 (quoting MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed.1992)).

10. The Supreme Court quoted the APA of mental retardation in *Atkins*:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system. "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.

*Ibid.* (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41, 42–43 (4th ed.2000)) (citations omitted).

11. *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim.App., 2004).

12. The additional factors adopted in *Briseno* include the following:

• Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

• Has the person formulated plans and carried them through or is his conduct impulsive?

• Does his conduct show leadership or does it show that he is led around by others?

• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

• Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

• Can the person hide facts or lie effectively in his own or others' interests?

• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, op at 8.

cant is mildly mentally retarded.[13]

The second report on which the trial court relied in concluding that the applicant is mentally retarded was by Dr. Ernest Brownlee, Jr., a psychiatrist who examined the applicant in 1988. Brownlee's report was admitted during the applicant's 1992 trial. According to the report, the applicant possesses an "extremely limited problem solving ability." The applicant's memory is consistent with an organic brain disorder. Also, the applicant is highly influenced by others, particularly his family. He said it is highly likely that the applicant could not function outside of a structured setting and should be housed either in a state school or at the Rusk State Hospital. Brownlee concluded that the applicant is mildly mentally retarded.

The third report on which the trial court based its conclusion was prepared by Dr. Frankie Clark, a licensed psychologist who examined the applicant in 1992, and who testified at the applicant's 1992 trial. The report was admitted into evidence during that trial. Clark administered the Wechsler Adult Intelligence Scale (Revised), and the applicant achieved a full scale I.Q. score of 58. Clark also administered the Wide Range Achievement Test (Revised Level II), and in reading, spelling, and arithmetic the applicant's abilities were at or below a third-grade level.

Regarding the applicant's adaptive functioning, Clark concluded that the applicant possessed significant deficits. He possesses regressed and intellectually defective coping skills; his approach to his environment is concrete; he is unable to interpret many abstract stimuli; he has significant difficulties with interpersonal relation-

ships; and he tends to misinterpret or distort perceptual input from other people, which most likely is the cause of his inability to make conventional or socially acceptable responses. Clark concluded that the applicant is mildly retarded and that his thought processes and emotions appear to show retardation in all areas. She also concluded that the applicant has been retarded since birth.

Clark also noted that the Texas Department of Criminal Justice (TDCJ) Mentally Retarded Offender Program examined the applicant in 1989. The social assessment performed at that time showed that the applicant possessed significantly subaverage adaptive behavior with the condition being developmental in nature. School records that Clark reviewed showed that the applicant was a slow learner with a speech defect. He repeated the sixth grade, and completed school only through the seventh grade.

## IV. Analysis

■ As we explained above, the trial court used the criteria set out by the AAMR and the APA. The trial court did not use the *Briseno* factors in its findings because it did not have the benefit of our order in that case. Nonetheless, we conclude that the trial court's findings are supported by the record.

This is not a case in which we have dueling experts. The three reports from the mental health experts that the trial court considered are consistent with one another and with the report from the TDCJ Mentally Retarded Offender Program. The reports establish that the applicant has (1) significant subaverage gen-

---

**13.** Although Kartye did not use the term mildly mentally retarded in his report, the facts discussed in the report indicate that the applicant has significant subaverage general intellectual functioning concurrent with deficits in adaptive functioning that manifested before age 18. This report is evidence of mental retardation and was admitted during the 1985 trial.

eral intellectual functioning, (2) concurrent with deficits in adaptive functioning, (3) that occurred before age 18. The applicant's IQ scores of 58 and 64 are well below the 70–75 score that generally indicates subaverage general intellectual functioning. Clark found that the applicant possesses deficits in several adaptive functioning categories, and she found that the applicant has been retarded since birth.

 The claim that the parties litigated the applicant's mental retardation claim during the 1992 trial is incorrect. Although evidence was admitted on the issue of mental retardation, there certainly was no special issue on mental retardation included in the jury charge. This evidence was relevant to the mitigation special issue.[14] If the applicant is mentally retarded, it mitigates his moral culpability. And, just because the jury answered the mitigation special issue "no" is not the equivalent of a jury finding that the applicant is not mentally retarded. Also the claim that the applicant "filed" a coherent *pro se* brief on direct appeal from his 1985 conviction does not necessarily support the conclusion that the applicant is not mentally retarded. It is common knowledge that there are "writ writers" in TDCJ who will write pleadings for other inmates.

While there may be some evidence to the contrary, there is significant evidence that the applicant is mentally retarded. The record supports the trial court's finding that the applicant is mentally retarded. The same trial judge who presided over the applicant's two trials made the findings and conclusions in this case. That trial judge was in the best position to evaluate conflicting evidence, and his findings deserve great deference.

In fact, it is not surprising that the trial judge found that the applicant was mentally retarded in this case. While *Penry* was pending before the United States Supreme Court, the applicant filed a subsequent application for a writ of habeas corpus. He claimed that he is mentally retarded and that the execution of the mentally retarded violated the Eighth Amendment to the United States Constitution. He also claimed that he was prevented from having the jury consider his evidence of mental retardation in the context of the special issues that were provided in the jury charge of his first trial. During those proceedings the trial judge found that the applicant is mentally retarded. As part of his findings, the trial judge said

> At the punishment phase of his trial, petitioner did testify and was allowed to present evidence of his mental retardation, brain damage, alcoholism, alcohol consumption at the time of the offense and purported abuse he suffered as a child. These matters were presented as mitigating factors of his punishment.... [P]etitioner is mentally retarded.

The trial court's finding has not changed.

We filed and set that application and granted relief on the basis of *Penry* error.[15] In our unpublished opinion disposing of the case, we quoted Kartye's testimony from the punishment phase of the applicant's 1985 trial. He said that "even under repeated testings in optimal conditions, his score would fall in the mentally

---

**14.** The mitigation special issue asks the jury "[w]hether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Tex.Code Crim. Proc. art. 37.071, § 2(e)(1).

**15.** *Ex parte Modden*, No. 71,312 (Tex.Crim. App. delivered Feb. 12, 1992) (not designated for publication).

retarded range." [16] After we discussed the Supreme Court's opinion in *Penry* and how evidence of mental retardation presents a double-edged sword, we said,

> Mr. Modden's evidence of mental retardation presented the same problem. Even as a rational jury might have found that appellant's mental condition made him less blameworthy, they were required to express their consideration of his mental condition in a way that would cause him to receive the ultimate sanction. The second special issue simply did not provide the jury with a way to give effect to mitigating evidence of mental retardation in this case.[17]

This Court has previously concluded that the applicant presented evidence of mental retardation at his 1985 trial.

We want to make clear that the parties' attempt to strike a plea bargain regarding the applicant's status as a mentally retarded person has no bearing on the outcome of this case. The trial court found, long before any agreement between the parties, that the appellant is mentally retarded. Our decision today is based solely on the trial court's findings, which are supported by the record.

We conclude that the record supports the trial court's findings that the applicant is mentally retarded. As a result, we ·grant relief. We reform the applicant's sentence to life imprisonment in the Texas Department of Criminal Justice Correctional Institutions Division.

KELLER, P.J., concurred in the judgment.

HERVEY, J., filed a dissenting opinion, in which KEASLER, J., joined.

HERVEY, J., dissenting, in which KEASLER, J., joined.

I respectfully dissent. The Court commutes applicant's death sentence to a life sentence based upon its decision that the record supports a finding that applicant is mentally retarded. However, after a careful consideration of all of the evidence, I would hold that the record does not support this finding.

In *Atkins v. Virginia*, the United States Supreme Court decided that the Eighth Amendment's "evolving standards of decency that mark the progress of a maturing society" prohibit executing mentally retarded people. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 2247–52, 153 L.Ed.2d 335 (2002). *Atkins* left to the states "the task of developing appropriate ways" to determine "which offenders are in fact retarded." *See Atkins*, 122 S.Ct. at 2250.

In response to this, this Court in *Ex parte Briseno* adopted the American Association on Mental Retardation (AAMR) criteria, which are codified in TEX. HEALTH & SAFETY CODE § 591.003(13), and some other evidentiary factors in addressing *Atkins* mental retardation claims. *See Ex parte Briseno*, 135 S.W.3d 1, 6, 8 (Tex.Cr.App., 2004) (mental retardation means "significant subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period").[1] We also stat-

---

16. *Id.*, slip op. at 2.

17. *Id.*, at slip op. at 2–3.

1. Some of the other evidentiary factors adopted in *Briseno*, slip op. at 12, include:
 ● Did those who knew the person best during the developmental stage-his family, friends, teachers, employers, authorities-think he was mentally retarded at that time, and, if so, act in accordance with that determination?
 ● Does his conduct show leadership or does it show that he is led around by others?

ed in *Briseno* that "the ultimate issue of whether [a] person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility." *See Briseno*, op. at 8.

This latter statement, however, does not quite apply to this habeas proceeding for several reasons. The record in this habeas proceeding reflects that, in exchange for applicant's guilty plea to several criminal offenses, the State agreed to a commutation of applicant's death sentence to a life sentence contingent on acceptance by the habeas court and this Court, of the parties' agreed finding and agreed evidence that applicant is mentally retarded. The State reserved "the right to oppose a finding of mental retardation" if this agreement cannot be fulfilled. In relevant part, this agreement, in the form of a letter from the State to applicant's lawyer, states:

> It is anticipated, understood, and expected that once your client [applicant] has plead guilty to the above five (5) offenses, and the same day and at the same proceeding in which your client pleads, **and only in the event that your client pleads to the above, the state will agree and stipulate that your client is mentally retarded** and that the state and yourself will present the [habeas court] with Agreed Findings of Fact and Conclusions of Law, along with **agreed evidence** of your client's mental retardation to that end. The state will further agree and request that your client's sentence of death be commuted to life. The parties hereto further un-

derstand and stipulate that this agreement is contingent upon [the habeas court's] acceptance of Agreed Findings of Fact and Conclusions of Law and the Court of Criminal Appeals' adoption of Findings of Fact and Conclusions of Law that find [applicant] to be mentally retarded.

> In the event that [applicant] does not plead guilty to the above referenced offenses or in the event [the habeas court] or the Court of Criminal Appeals does not accept or adopt the Agreed Findings of Fact and Conclusions of Law, **the state reserves the right to oppose a finding of mental retardation.**

(Emphasis added).

The agreed evidence between the State and applicant consists of Kartye's 1985, Brownlee's 1988, and Clark's 1992 psychological evaluations of applicant which are discussed in the Court's opinion. *See Ex parte Modden*, 147 S.W.3d 293, 296–97 (Tex.Cr.App. No. 74,715, delivered this date). Without hearing any live testimony, the habeas court apparently accepted these psychological evaluations and signed off on the parties' agreed finding that applicant is mentally retarded. This finding tracks the AAMR and the Section 591.003(13) definitions of mental retardation. *See Briseno*, op. at 6, 8. But, none of these psychological evaluations state that they are based on the AAMR and the Section 591.003(13) definitions of mental retardation. And, neither Kartye, Brownlee nor Clark have ever testified that their psychological evaluations and opinions are based on the AAMR and the Section

● Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
● Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

● Can the person hide facts or lie effectively in his own or others' interests?
● Putting aside any heinousness or gruesomeness surrounding the capital murder, did the commission of that offense require forethought, planning and complex execution or purpose?

591.003(13) definitions of mental retardation.

The agreed finding in this habeas proceeding that applicant is mentally retarded also is not the result of "determinations of credibility" at an adversarial live hearing meant to test the truth of applicant's mental retardation claim. More important, the parties' agreed evidence does not take into account all of the evidence pertinent to applicant's claim of mental retardation from applicant's 1985 trial and his 1992 retrial. *See Briseno*, at 8 (mental retardation determination must be based upon all of the evidence). For example, the parties litigated applicant's mental retardation claim in an adversarial setting before a jury at applicant's 1992 retrial where the State presented its own psychological expert who testified that applicant is not mentally retarded.[2] It is fairly obvious from examining the 1992 record from applicant's 1992 retrial that the jury rejected applicant's claim that he is mentally retarded.[3] *See Ex parte Taylor*, 101 S.W.3d 434, 440–45 (Tex.Cr.App.2002) (determining from an examination of the record what a jury found by a general not guilty verdict). *Briseno*, therefore, does not require this Court to accept the agreed finding that applicant is mentally retarded based on Kartye's 1985, Brownlee's 1988, and Clark's 1992 psychological evaluations of applicant. This is not to say that these evaluations are irrelevant, but they should be considered with all of the other relevant evidence that completes the inquiry into applicant's claim of mental retardation.[4]

Overwhelming evidence was presented at applicant's 1985 and 1992 trials that applicant meets very few, if any, of the *Briseno* factors and that applicant is nothing like Steinbeck's childlike Lennie.[5] *See Briseno*, at 6, 8. This evidence indicates that applicant has been a violent criminal for most of his adult life. Though the evidence does indicate that applicant may have limited intellectual capabilities, it also indicates that no one considered applicant to be mentally retarded while he was growing up and that upon reaching adulthood applicant has been able to take care of himself both in and out of prison where (even before he committed this capital offense in 1984) he spent a good part of his adult life. The thrust of his mental deficiency evidence at both his 1985 and 1992 trials is that applicant's mental deficiencies cause him to have poor impulse control and to be influenced by others for their own means, and that all of this is exacerbated by applicant's frequent use of alcohol. But the evidence shows that many of the criminal offenses that applicant has committed during his life were planned and carried out all by himself.

The evidence also indicates that applicant might even possess some leadership qualities. For example, a September 6, 1982, prison disciplinary report indicates that applicant was placed in Administra-

2. This testimony is not mentioned in either the habeas court's findings or this Court's opinion granting applicant habeas corpus relief on his mental retardation claim.

3. *See Briseno*, op. at 21 (Holcomb, J., dissenting) (persons like applicant "have the right to a jury determination on the issue of mental retardation").

4. It could be argued that this Court should accept the parties' agreed finding and that the only evidence that this Court should consider is Kartye's 1985, Brownlee's 1988, and Clark's 1992 psychological evaluations of applicant. *Briseno*, however, says that the mental retardation determination must be based "upon all of the evidence." *See Briseno*, op. at 9. And, here the agreed finding ignores other overwhelming evidence that applicant is not mentally retarded.

5. *See Briseno*, op. at 6 citing JOHN STEINBECK, OF MICE AND MEN (1937).

tive Segregation for inciting other inmates not to perform their work duties.

On September 6, 1982, at approximately 3:15 P.M., I noticed that the trays in both the North and South Dishrooms were stacking up and not being washed. I then entered the dishroom and found that all of the inmates assigned to the Dishroom were refusing to wash any of the trays. These inmates were [applicant and five others]. These inmates stated that they were refusing to wash any dishes because they could not get any ice water in the Dishroom. [Applicant] was placed in Administrative Segregation in order to prevent the inciting of further work stoppages and to prevent the disruption of unit procedures.

The evidence also indicates that applicant is capable of responding "coherently, rationally and on point to oral or written questions." *See Briseno,* op. at 8. For example, an October 5, 1982, prison disciplinary report states:

On October 5, 1982, at approximately 2:20 P.M. while A/L work force was cutting weeds, [applicant] was overheard to say "Fuck the boss and old motor mouth too." Upon questioning [applicant] he again stated "Fuck you and the Captain because you'll [sic] ain't going to fuck with me." I told [applicant] to go to work and he replied "If I get a case, I am not going to work and I am going to sue your ass.["] [Applicant] was placed

in adminsstrative [sic] segregation in order to prevent a disruption of unit procedures.

The record further indicates that applicant presented no evidence at his 1985 trial that he was mentally retarded. Kartye's 1985 psychological evaluation, which was admitted into evidence at that trial, does not conclude that applicant is "mildly mentally retarded." [6] And, Kartye never testified at applicant's 1985 trial that applicant is "mildly mentally retarded." Kartye never even used the term "mental retardation" at applicant's 1985 trial. Kartye testified that applicant's "limited intellectual resources" caused him to have "impulse control problems" but that applicant was also capable of acting deliberately.[7] It is also significant that applicant filed a coherent *pro se* brief on direct appeal from his 1985 capital murder conviction.[8]

Applicant did claim that he was mentally retarded at his 1992 retrial after the United States Supreme Court had decided *Penry v. Lynaugh* which held that the then-existing Texas special issues framework failed to provide Penry's jury with a vehicle to give mitigating effect to relevant mitigating evidence of Penry's severe mental retardation.[9] Two psychological evaluations of applicant (Brownlee's 1988 evaluation and Clark's 1992 evaluation), concluding for the first time that applicant is "mildly mentally retarded," [10] were ad-

---

**6.** The Court's opinion and the habeas court's findings incorrectly claim otherwise. *See Modden,* slip op. at 6 (stating that "Kartye concluded that the applicant is mildly mentally retarded").

**7.** Kartye did testify, consistent with his 1985 report, that applicant's overall score on the Wechsler Adult Intelligence Scale was 64 which is 5 points higher than Atkins' overall score of 59. *See Atkins,* 122 S.Ct. at 2245.

**8.** The Court's opinion states that it is common knowledge that the prisons are full of "writ

writers." This may be so but it does not prove that a writ writer prepared applicant's brief for him.

**9.** *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2947–49, 106 L.Ed.2d 256 (1989).

**10.** Clark's 1992 evaluation of applicant indicates that applicant's overall score on the Wechsler Adult Intelligence Scale had dropped from 64 in 1985 to 58 in 1992 which is 1 point less than Atkins' overall score of 59. *See Atkins,* 122 S.Ct. at 2245

mitted into evidence at applicant's 1992 retrial. Before this no one had ever previously noticed applicant's mental retardation.

Brownlee did not testify at applicant's 1992 retrial. According to Brownlee's 1988 evaluation, applicant, unlike Steinbeck's Lennie, enjoys torturing animals. This evaluation, among other things, states:

> [Applicant] said that he tortured animals often, either by burning them or hanging them. Upon exploration of the feelings associated with that, he had no affective statement, but he said he did like to see them suffer and squirm.

Clark testified at applicant's 1992 retrial. Among other things, she testified that she would place applicant "somewhere as far as functioning in the lower three to five percent of the population," meaning apparently that, according to Clark, three to five percent of the population is "mildly mentally retarded" which interestingly is about three to five times more than that claimed by the defense expert in *Atkins.* *See Atkins,* 122 S.Ct. at 2245 n. 5 (forensic defense psychologist testified that mental retardation is "a relatively rare thing" affecting "about one percent of the population"). The State commented on this during closing jury arguments:

> Now, let's talk about psychologists a little bit. Dr. Frankie Clark came up here, and I think she testified as to her honest opinion. She says he's retarded. She says about 50 people out of 1,000 would be about in the same boat as the Defendant. So if there are 30,000 people in our town, about 1,500 are in the same boat as Willie Mack Modden.

The State presented its own psychological expert at applicant's 1992 retrial. This is the only psychological expert to testify on the issue of applicant's mental retardation based on the AAMR and the Section 591.003(13) definitions of mental retardation. Mostly through the use of supported-by-the-evidence hypotheticals, the State's psychological expert testified at applicant's 1992 retrial that applicant is not mentally retarded under the AAMR and the Section 591.003(13) definitions of mental retardation.

> Q. Okay. Now, Dr. Quijano, you know that one of the things in controversy in this trial is the issue of mental retardation. Could you tell the jury, please, sir, what is mental retardation?
>
> A. Mental retardation is a condition of an individual that has to meet three criteria, and all three must be met before the label of mental retardation can be legitimately given.
>
> Number 1, the individual must have a subaverage or below-average intellectual functioning as measured by an individually administered intellectual test, intelligence test.
>
> Number 2, which is very important, and that is, the individual must have an adaptive daily functioning skill that's below average and that would require constant supervision.
>
> Number 3, that these two deficits, the intellectual as well as the adaptive deficits, must occur before age 18 to rule out victims of stroke and accidents with brain trauma.
>
> Q. Okay. Now, doctor, you mentioned functioning skills and adaptive behavior. What sort of things are you talking about?
>
> A. By adaptive skills, we mean the skills needed by an individual to live on a day-to-day basis. And those are-the questions asked are as follows:
>
> Are they able to take care of their own personal hygiene? Can they eat without assistance? Can they recognize hunger? Can they procure food for themselves?

Can they cook simple meals? Can they recognize danger in that you don't cross the street when a big truck is coming your way? Can they go to a store and negotiate a purchase? Can they know if they're being cheated by somebody else? Can they take medicine when they are told to or when they need to?

All of these things are considered adaptive skills, or some people call them daily skills of daily living.

Q. Okay. Dr. Quijano, let me ask you this. Assume, please, sir, that the person-the Defendant that we're concerned with here today, Willie Mack Modden-assume that there is evidence that the Defendant is able to play dominoes, to keep score; assume that he is able to play chess. Assume that he is able to play basketball.

Assume that he is able to order materials and construct jewelry boxes out of matchsticks with designs. And assume that he is able to negotiate to sell those to people. Assume that he says, hey, buy this for your girl friend; I know you've got a girl friend or somebody you want to give this to; hey, will you give me $15; you won't do that; will you give me 12.

Assume, doctor, that we're dealing with an individual who, by himself, stashed a gun and kept it for some period of time and until he needed it; then he went and got the gun, and he went and hid in some bushes outside of a convenience store. And he waited until near closing time, and he waited until the lady took the trash out. And he pulled the gun on her, and he made her go back in the store. And he made her give him the money. And then assume, doctor, that he made the woman pull her clothes off so that she would have to re-dress to avoid embarrassment before she summoned help to give him more time to get away.

Assume, doctor, that this person, when they were incarcerated in TDC, learned the rules and regulations of the Texas Department of Corrections. And assume that if a guard did something that he didn't approve of or that he felt was against the rules, that he would summon another guard. And if that guard was not able to answer his question, assume, doctor, that he would summon the supervisor, such as the sergeant, and that he would verbalize his complaint and say: this is against the rules; that man can't do that to me.

And assume, doctor, that this person were incarcerated in jail. And assume that they decided that they wanted to escape. And assume that they got with other inmates, and assume that they battered a hole in the wall. And assume that the Defendant said, I'm going to get out, and I'm going to burn down the courthouse so there won't be records on me. And assume, doctor, that this person said, I'm then going to go kill the people that helped put me in the penitentiary in the first place.[11]

And assume, doctor, that this person were [sic] offended by somebody. Assume somebody hit this person when they were in the penitentiary. And assume that they procured razor blades, and assume that they melted them into the handle of a toothbrush. And assume that they waited until the next day when the offending person was in the shower and had their face lathered up. And assume that this person then went in and cut that person's throat.

**11.** *See Briseno,* op. at 9 (one evidentiary factor is whether the person's response to external stimuli is "rational and appropriate, regardless of whether it is socially acceptable").

Doctor, are these things consistent with a mentally retarded person?

A. No, they are not.

Q. Can you tell me why they're not?

A. The hallmark of a mentally retarded person is simplicity of thinking; that they can maybe handle one thing at a time, maybe two. The mentally retarded people used to be called the simple-minded.

These behaviors that you have described are very complex behaviors. They require multiple steps in the mind. They require that you-that you keep four or five, six different things in mind and then manipulate them intellectually and mentally. Those are complex acts. The planning, the forethought, the anticipation of consequences, the thinking on the feet; all of those are complex mental activities that a true mentally retarded person, by definition, cannot do.[12]

This expert also provided several explanations on why applicant's IQ test scores contained in his penitentiary records ranged from 57 to 83 before he got into this current trouble.

Q. Okay. Now, in this record where it shows the Defendant's age of 18, which is marked as State's Exhibit 26, it shows an IQ score of 57?

A. That's correct.

Q. Okay. Now, in this record, which is State's Exhibit Number 28, and it shows the Defendant's age as 26. What IQ score does it show?

A. It shows 83.

Q. Now, I will-these records are here, doctor, if you need to look at them further to explain that; but I'd like to discuss that with the jury and-how do you account or can you account, sir, for the wide range in variations of IQ scores in the 57 range all the way up to 83. What's the deal?

A. Okay. The-given this information, if I were asked to account for that-assuming that the tests were administered properly, and the only thing has changed would be the motivation of the person taking the test.

If you are tested before your trial, it is to your best interests to test down. If you are tested after the trial, once you're in prison where you may be wanting a better job assignment, where you may be wanting to go to school, or where you may be wanting a more free living arrangement-the better you are off, the better your chances are because if you are retarded in a prison, then your movements are limited. You're supervised more. You cannot get good jobs and so on and so forth.

So one possibility is that you are now-you are no longer playing to the problem of facing charges; that is all behind you, and you are testing better and maybe more accurately. However, there are prisoners who would say, I tested down, because these people may want to be assigned to Beto I, which is closer to their home, and that is where the mentally retarded program is; and you test down.

Or you may want to have other programs available for the mentally retarded that that is not available for general population. And people do that all the time. They get to the MR program; and they say, well, this is not what I expected; give me another test. And they test higher, and we kick them out.

Q. Dr. Quijano, let me ask you this. I believe that the test where the IQ score is 83 shows an interview on September the 10th, 1974. Now, would there be

12. *See generally Briseno,* op. at 9.

any change-is there any reason for a person to change their attitude toward testing between 1974 and now in the penitentiary system to your knowledge?

A. Yes.

Q. Could you explain that to the jury, please, sir?

A. Before 1984, when I went back to the system to implement the federal court orders, there was no specialized program for the mentally retarded, and there was no special arrangement for them. You were essentially treated by the system the way the system thought mentally retarded people should be treated. And the motivation at that time was to test up because you have to compete with other inmates for better jobs. These days there is less motivation for that.

The motivation now, depending on what you want, is to test down because you have a richer environment in a specialized program. Our mentally retarded program is a very expensive program because you have case managers and music therapy and occupational therapy. You have your own gymnasium. You have your own schools. It's a lot richer program. You have basic janitorial skills training and job programs. So the motivation has shifted in the prison, depending on what you want to accomplish.

This expert also testified that a person cannot fake a higher IQ score "because you either know the answer or you don't."

Q. I've got a couple of things, Dr. Quijano, that I want you to look at. I'm going to try to be brief on this. This is Dr. Clark's report, I believe. And we've got Dr. Kartye's test here. And this, I believe, is a psychiatric evaluation by Dr. Brownlee. Okay?

First, I want to talk about the two tests which have scores on them. Now, doc-

tor, I'll ask you to-well, there's a date on this. We don't have to assume anything. Examined 1-26-1985; examination, 7-11-92. Now, you mentioned performance IQ. And I believe that Dr. Kartye's report reflects a performance IQ of 74, and Dr. Clark's report reflects a performance IQ of 65. Is this, the more recent test, lower?

A. Yes.

Q. What-how do you square that up?

A. Well, two possibilities. The most recent test is more suspect than the previous test for two reasons. Number one, a person cannot fake correct answers because, if you give the correct answers, you obviously know the correct answers. So it is-if you score high-if you're asked questions, and you gave the answers, you obviously know at this level. It is much easier to say, I don't know.

It's easier to fake lower scores than to fake higher scores. You cannot fake higher scores because you either know the answer or you don't. You can fake a lower score by saying, I don't know, or if you don't have enough motivation to complete the test, or if you're not trying too hard.

The second possibility in which our profession is warned against is testing when one is in trouble. You must always suspect what we call malingering; that is, an exaggeration of symptoms when one is in trouble because of our human nature to protect ourselves. And so these scores can be explained by those two possibilities.

The State's expert also testified that his opinion about applicant's mental capacity was based in part on applicant's prison records before he got into this current trouble and that any testing of applicant

after he got into this trouble would be of no benefit.

Q. Okay. Do you have sufficient information at your disposal to form an opinion about him and his mental capacity?

A. Yes, I do.

Q. Okay. And you have how many years' worth of penitentiary records?

A. The Defendant's records?

Q. Yes, sir.

A. Not mine. Okay. Four tenures in TDC.

Q. Okay.

A. I don't know the exact number of years.

Q. And, doctor, do you have at your disposal the test results of other psychologists?

A. Yes, I do.

Q. Would it be of benefit to you to be able to test the Defendant?

A. At this late stage it would not be of benefit to me or anybody to test him because of the motivation factor. A person that's in trouble-and the answers are now questionable, and we can repeat this over and over again, and we'll get different test results, depending on what the situation is.

The best evidence that applicant is not mentally retarded came from applicant himself when he testified at his 1985 trial.[13] Applicant testified at the punishment phase of his 1985 trial how he robbed a convenience store clerk and stabbed her 16 times in the face and neck while she begged for her life and implored applicant to consider her three children. Applicant later, matter-of-factly, described to several friends how he murdered the sobbing and terrified victim. Applicant testified that he decided to kill the victim before he actually killed her (meaning that he "deliberately" killed her). He testified that he killed the victim because he did not want to leave any witnesses. Applicant's testimony from the punishment phase of this trial also indicates that after the crime applicant was smart enough to destroy evidence and to "artfully dodge" police questioning about his involvement in the crime.[14] Applicant also testified about his plan to take a hostage and escape from the county jail.

---

**13.** This coherent testimony covers 221 pages in the reporter's record and is attached as an appendix to this opinion. *See Atkins,* 122 S.Ct. at 2244 (noting that the trial testimony of Atkins' accomplice was "more coherent and credible" than Atkins' trial testimony). This testimony was introduced at applicant's 1992 retrial. Applicant did not testify at his 1992 retrial.

In his direct appeal from his 1992 capital murder conviction, applicant claimed (in grounds 14 and 15) that his lawyer from his 1985 trial was ineffective for permitting applicant to testify at the 1985 trial apparently because this testimony seriously undermined applicant's mental retardation claim at his 1992 retrial. In his brief, applicant argued that his "[1985] trial testimony was inherently damaging to [applicant], and when considering the expert testimony referred to in another ground of error, the decision by [appli-

cant's lawyer from the 1985 trial] cannot be viewed in the context of strategy." This Court rejected this claim on direct appeal. *See Modden v. State,* slip op. at 13–15 (Tex.Cr. App. No. 71,493, delivered June 8, 1994) (nonpublished).

**14.** The State commented on this during closing jury arguments at applicant's 1992 retrial:

But I ask you to do this: When you think about the issue of intoxication, look at the actions of the Defendant and see what makes sense. Look at how he was able to remember how many times he stabbed her. Remember how he was able to pause and watch when the police car drove by. Remember how he was able to burn his shirt. Remember how he was brought in and questioned by the police officers, and remember how he was able to artfully dodge their questions such that he was not caught until some months later.

The State's psychological expert testified at applicant's 1992 retrial that, in forming opinions about a person's mental ability, it is also important "to look at what the person actually does" and not to make judgments "about a person's character on the basis of test results only."

Q. Doctor, is it possible to look at what someone actually does and use that as a basis for an opinion as to that person's mental ability or that person's future behavior, just as you could use test results?

A. Well, it's more important to look at what the person actually does. And it is not professional or ethical to make a judgment about a person's character on the basis of test results only.

Responding to Kartye's psychological testimony, the State argued during closing jury arguments at applicant's 1985 trial:

Then you have to go toward the glimmer of hope that you can get somebody sidetracked on some collateral issue. As it turned out, it was totally insignificant in answering those two questions. And that is when in desperation, Joe Kartye was called to testify. You know, Joe Karty [sic]. I like Joe Karty [sic]. He's a likeable type person. I didn't agree with him on some things. Some things I don't disagree with him on.

For instance, the report that you have shows that [applicant] has a low I.Q. and he is easy led [sic] and he strikes out and he acts impulsively. And I believe a lot of that. I don't think that he is the most intelligent person in the world, but I think he is smarter than Mr. Kartye gives him credit for being.

And you saw him on the witness stand. On direct examination and cross examination and on many occasions he corrected what his attorney said. He would back up and re-phrase what I said or whatever the situation was. This man is very alert as to what was going on, and he knows the consequences of what he was doing, and that is why we are here today on the issues of deliberate and probability.

Considered in its entirety, the record does not support the habeas court's finding that applicant is mentally retarded. *See Briseno,* op. at 12 (this Court's review of a trial court's findings of fact and conclusions of law on a mental retardation claim "remains the same as it has always been on habeas corpus applications," and this Court may reject the habeas court's findings that the record does not support). The evidence overwhelmingly supports a finding that applicant is not mentally retarded, and the contrary opinions of applicant's psychological experts can politely be described as "incredulous as a matter of law." *See Atkins,* 122 S.Ct. at 2246 (noting that the dissenters in the Virginia Supreme Court rejected the state's expert opinion that Atkins possesses average intelligence as "incredulous as a matter of law").

The Court's opinion makes much of the habeas court's pre-*Penry* finding from a 1988 habeas proceeding that applicant is "mentally retarded" [15] and of this Court's 1992 opinion from that proceeding deciding that applicant's "evidence of mental retardation" entitled him to a new trial under *Penry.* [16] The record does indeed reflect that in 1988 applicant filed a habeas corpus application claiming, among many other things, that the execution of a mentally retarded person would violate the Eighth Amendment and that this very issue was then pending in the United States Su-

---

15. This finding actually states that applicant is "mildly mentally retarded."

16. *Ex parte Modden,* slip op. at 2 (Tex.Cr.App. No. 71,312, delivered February 12, 1992).

preme Court in *Penry*. The record also reflects that the habeas court conducted a hearing on this habeas corpus application in November 1988. At this hearing Kartye testified on behalf of the State. Kartye actually used the term and, testified for the first time that applicant was suffering from, "mild mental retardation."

Q. [STATE]: Dr. Kartye, you're the same Dr. Kartye who previously examined [applicant], were you not?

A. [KARTYE]: Yes.

Q. According to your examination, did you make a determination as to his level of intelligence?

A. Yes, I did.

Q. And do you recall what that was?

A. Mild mental retardation.

Kartye also testified on direct examination that applicant was capable of acting "deliberately."

Q. [STATE]: From having examined [applicant], Doctor, I would ask if whether or not you feel he could ever act deliberately?

A. [KARTYE]: Yes, I feel that he can.

On cross-examination, Kartye testified that applicant could adequately function outside an institutional environment but not without endangering himself or others.

Q. [DEFENSE]: Dr. Kartye, in the report that you provided during the trial of this case in 1985, you stated and I quote, "It would appear that [applicant] lacks cognitive and behavioral controls necessary to effectively regulate his behavior." Do you recall that statement?

A. [KARTYE]: Yes, I do.

Q. Do you believe that that's the truth?

A. Yes.

Q. And with regard to your testimony here this morning, did I understand you to state correctly that most mildly re-

tarded persons can function adequately outside an institutional environment?

A. Yes, they can.

Q. Do you believe that [applicant] can?

A. He has functioned outside the environment all his life until he was arrested.

Q. You're aware of his criminal record, aren't you?

A. Yes.

Q. Do you think he could function outside a structured environment without endangering himself or others?

A. No.

On re-direct examination, Kartye testified that applicant's inability to function outside of a structured environment without hurting other people was because of his past criminal history and not because of his degree of mental retardation.

Q. [STATE]: Dr. Kartye, just one question. You said a minute ago that, in your opinion, [applicant] could not function outside-in society without doing harm to himself or others; is that correct?

A. [KARTYE]: That is correct.

Q. Is that based-do you base that opinion on his degree of mental retardation or his past criminal history?

A. His past criminal history.

Brownlee testified at the November 1988 habeas hearing on applicant's behalf. Brownlee testified that applicant is mentally retarded which causes applicant not to have the intellectual capability to act "deliberately" or "intentionally" or of being "sane." For example, Brownlee testified how applicant's mental retardation causes applicant not to have the intellectual capability to be "sane" in the sense of knowing the difference between right and wrong and that for applicant "hurting another person would be like soiling his pants."

Q. [STATE]: Why do-why would he try to hide his wrong if he didn't know the difference?

A. [BROWNLEE]: Because there's a higher level of wrong that we imply to being caught in doing something bad. You know, there is a certain degree of shame at messing your pants, and I'm sure that, you know, [applicant] would have that shame if he soiled his pants. And in his mind hurting another person would be like soiling his pants. It's a thing that causes shame, but it's not something that you feel so bad about because you understand the long-term implications of death, that you understand the impact on other people. Like he told me in my interview, he made [the victim] go to Heaven, and people should be happy about that. That's an absurd assumption for a person who has a higher degree of intelligence.

Q. So you really think that he thinks he did nothing wrong, and they should be happy because he made her go to Heaven?

A. That's what he told me, yeah.

Brownlee also testified that Kartye's psychological report was "insufficient to help [him] in any way."

Q. [DEFENSE]: Referring you back to Dr. Kartye's report, based on your knowledge and experience as a psychiatrist, do you have an opinion as to the overall quality of his examination of [applicant]?

A. [BROWNLEE]: If this was a report prepared by a psychologist that I would ask-I'd have him redo it because it's insufficient to help me in any way.

The State also presented several police witnesses who testified that, during their numerous interactions with applicant prior to his 1985 trial, they did not notice applicant's mental retardation. One of these witnesses apparently surprised the defense

when he testified that he has "personal knowledge of how a mentally retarded person might" act.

Q. [DEFENSE]: Have you had experience before in your work with mentally retarded defendants?

A. [MORRIS]: Would you-

Q. Have you ever-in the course of your investigation as an officer of the Department of Public Safety, have you ever dealt with mentally retarded defendants?

A. Not that I know of, sir.

Q. So you don't-you don't have any personal knowledge of how a mentally retarded person might interact with you as opposed to a person of normal intelligence?

A. Yes, I do.

Q. And what is that based on?

A. I have a son that's [sic] mentally retarded.

Q. But you've never dealt with any mentally retarded defendants?

A. No, I have not.

Q. And you had no reason in your discussion with [applicant] to think that he was mentally retarded?

A. I do not.

[DEFENSE]: Pass the witness.

To the extent that the Court's opinion suggests that the habeas court's finding in the 1988 habeas proceeding that applicant is "mildly" mentally retarded is dispositive or collaterally estops a consideration of all of the other evidence, it is significant to point out that the habeas court made this finding before the United States Supreme Court decided *Penry*. This finding, therefore, was not essential to the habeas court's determinations in the 1988 habeas proceeding, and the State did not need to fully and fairly adjudicate the issue of applicant's mental retardation at this time.

*Cf. Ex parte Watkins,* 73 S.W.3d 264, 267 (Tex.Cr.App.2002) (collateral estoppel bars relitigation of "specific and discrete facts that have been fully and fairly adjudicated"); *Johnston v. American Medical International,* 36 S.W.3d 572, 576 (Tex.App.-Tyler 2000, no writ) (collateral estoppel bars relitigation of facts that were fully and fairly adjudicated and essential to the judgment in the first action). For these reasons, this Court's 1992 opinion granting applicant habeas corpus relief also is not dispositive of whether applicant is mentally retarded.

That the issue of applicant's mental retardation was not essential to the habeas court's determinations in the 1988 habeas proceeding is underscored by the habeas court's recommendation to deny habeas corpus relief despite its finding that applicant is "mildly" mentally retarded. The issue of applicant's mental retardation was not fully and fairly adjudicated until applicant's 1992 retrial. There the State litigated this issue with its own expert who is the only psychologist to express an opinion on applicant's mental retardation based on the AAMR and the Section 591.003(13) definitions of mental retardation that this Court adopted in *Briseno.*

What this case really boils down to is whether this Court should stand in the way of the bargain the parties made in this habeas proceeding. At this point in the judicial process of this 20-year-old case, I do not believe that this Court has (or should exercise) the power to effectuate this bargain through the vehicle of a mental retardation claim which the record does not support. Just as executing a truly mentally retarded person would not advance any "evolving standards of decency that mark the progress of a maturing society," allowing the parties to use a mental

retardation claim not supported by the record as a bargaining chip to dispose of this case would not advance any evolving standards of decency either. *See Atkins,* 122 S.Ct. at 2247. On the contrary, effectuating this bargain based on an unsubstantiated mental retardation claim would promote a sort of "devolving standard of decency" that marks a society indifferent to the dignity of the victim whom applicant so brutally murdered. *Cf. Atkins,* 122 S.Ct. at 2247 (basic concept underlying Eighth Amendment jurisprudence "is nothing less than the dignity of man").[17]

I respectfully dissent.

## APPENDIX

This Appendix contains the following:

Reporter's Record at 2169–2171 (Applicant's direct examination outside the jury's presence at the guilt/innocence phase of his trial on the issue of the voluntariness of his written statement).

Reporter's Record at 2171–72 (Applicant's cross-examination outside the jury's presence at the guilt/innocence phase of his trial on the issue of the voluntariness of his written statement).

Reporter's Record at 2483–2634 (Applicant's direct examination in the jury's presence at the punishment phase of his trial).

Reporter's Record at 2676–2743 (Applicant's cross-examination in the jury's presence at the punishment phase of his trial).

## WILLIE MACK MODDEN

the defendant, was called as a witness in his own behalf and, having been duly sworn by the Court, testified as follows to questions propounded to him by Counsel.

---

**17.** To effectuate their bargain, the parties may have the remedy of seeking executive clemency for applicant conditioned upon applicant fulfilling his part of the bargain.

 

DIRECT EXAMINATION

QUESTIONS BY MR. ASKINS:

Q Mr. Modden, is this your signature here?

A Yes, sir.

Q Do you recall down in Kirbyville, Texas, when you went before Mr. C.R. Doughorty, Justice of the Peace down there?

A Yes, sir.

Q Do you remember him giving you this warning?

A Yes, sir.

Q That's as to State's Exhibit Forty?

A Yes, sir.

Q Now, what is marked State's Exhibit Forty-one—excuse me. Forty-two. Do you recognize this to be your signature?

A Yes, sir.

Q Do you remember Judge Hulen McClure here in Angeline County, 15th day of October, 1984, 2:28 P.M. giving you this Magistrate's warning?

A Yes, sir.

Q And did you give both of those—Did you hear both of those clearly and understand them—

A Yes, sir.

Q —when they were given to you?

And you heard Mr. Goodwin testifying about what is marked State's Exhibit Forty-three, but which is not yet admitted.

Now, you had an opportunity to read over this statement in the past on occasions?

A Yes, sir.

Q Did you read it that day before you signed it?

A Yes, sir.

Q Did anybody force you to sign this statement?

A No, sir.

Q Did you give it voluntarily?

A Yes, sir.

Q Were you in threat of your life or freedom?

A Freedom.

Q Well—

A I wasn't threatened.

Q You were in jail at the time, weren't you?

A Yes, sir.

Q Nobody was threatening you, were they?

A No, sir.

Q Or were they?

A No, sir.

Q Did you have a lawyer with you at the time that you signed these papers?

A No, sir.

Q But you had not asked for one either, had you?

A No, sir.

Q Or had you?

A No, sir.

Q All right. But are you telling the court you signed all four pages of that voluntary statement that is dated October 15, 1984, freely and voluntarily and by your own choice?

A Yes, sir.

Q Without anybody forcing you to, but because you wanted to?

A No, sir.

Q Is that correct?

A Yes, sir.

MR. ASKINS: All right. Pass the witness.

## CROSS EXAMINATION

QUESTIONS BY MR. GOODWIN:

Q Mr. Modden, again, all of these, you understood what your rights were, did you, sir?

A Yes, sir.

Q And all of these things that were said to you, you knew what you were talking about, didn't you?

A Yes, sir.

Q In the statement, Willie Mack, there was given voluntarily, wasn't it?

A Yes, sir.

MR. GOODWIN: I have no further questions, Judge.

MR. ASKINS: We have no further questions, Your Honor.

THE COURT: You may step down. Any further witnesses?

MR. ASKINS: No, Your Honor.

THE COURT: Okay. I will make a finding that what is marked as State's Exhibit Number Forty-three was made freely and voluntarily.

MR. ASKINS: Yes, sir. Your Honor, as to one Magistrate's warning, I fail

## WILLIE MACK MODDEN

the defendant, took the witness stand in his own behalf and, having been first duly sworn by the Court, testified as follows to questions propounded to him.

## DIRECT EXAMINATION

QUESTIONS BY MR. ASKINS:

Q State your name, please.

A My name is Willie Mack Modden.

Q Mr. Modden, how old are you?

A Thirty-six.

Q Where were you born?

A Honey Island.

Q Where is Honey Island, Texas?

A Oh, over there close to Kountze, Texas.

Q Who is your natural mother?

A Dosie May Young.

Q Was that the lady who just testified?

A Yes, sir.

Q Do you call another woman momma?

A Yes, sir.

Q Who is that lady?

A Rosalie Modden.

Q And who raised you?

A Rosalie Modden.

Q And there is no question about—let me stop right there and ask you a question.

Do you understand you are not required to testify?

A Yes, sir.

Q You understand that you are on the stand now and you have commenced testifying?

A Yes, sir.

Q You understand that you are available for cross examination by District Attorney Gerald Goodwin or anybody substituting for him in this case?

A Yes, sir.

Q Do you realize that this jury has found you guilty of the offense of capital murder?

A Yes, sir.

Q And you do understand the range of punishment for this case, do you not?

A Yes, sir.

Q Do you understand that range of punishment to be life or death?

A Yes, sir.

Q Do you understand that if you testify, what you say will be considered by this

jury to the degree that they are willing to consider it?

A Yes, sir.

Q Do you understand that they are not required to give your testimony any more or any less value, as far as probative value, than any other witness that has taken the stand before you or any witness who might take the stand after you in this case?

A Yes, sir.

Q Is it still your desire to go forward and testify?

A Yes, sir.

Q All right, sir. And I believe you testified that Rosalie Modden raised you. Is that right?

A Yes, sir.

Q And do you recall when you moved from Honey Island?

A Well, sir, I was young. About the first grade, I think.

Q And you heard your momma's testimony. Are you in agreement, from what you've been told in your childhood, that she basically turned you over to—

A I agreed to it.

Q Sir?

A Yes, sir.

Q What was my question?

A I agree about she turning me over to my auntie.

Q All right, sir. Listen to my question very carefully—

A Yes, sir.

Q —and answer them after I get through asking them.

A Yes, sir.

Q Did Rosalie Modden raise you?

A Yes, sir.

Q Who was her husband?

A L.C. Modden.

Q Did you ever live in your childhood anywhere other than Honey Island?

A Conroe. Then I moved from Conroe to Silsbee.

Q Were you always with Rosalie Modden's family?

A Yes, sir.

Q Did you ever live with your natural mother, Dosie May Young?

A Yes, sir, but not—you know, live with her, you know, or stay with her.

You know, my auntie would take me up there.

Q Did Rosie Young live with her husband?

A Rosalie Modden?

Q Modden. I'm sorry.

A Repeat that again.

Q Was Rosalie Modden married?

A Yes, sir.

Q To whom?

A L.C. Modden.

Q Do they continue to live together today?

A Yes, sir.

Q To your knowledge.

A Yes, sir.

Q How many children did they have?

A They had five girls and one boy. I think five girls and one boy. Yes, sir. Because I make seven all together.

Q Was your momma correct when she said that there was a girl older than you, and all the rest of the kids were younger than you?

A Yes, sir.

Q How did you get along with those children?

A I got along good.

Q You never had any fusses with any of them?

A Oh, yes, sir.

Q Did you ever have any fights with any of them?

A Yes, sir.

Q Who did you have the most fights with of those kids?

A I really can't tell.

Q Did you get along real good or poorly with that older girl?

A We got along good until we got up in age.

Q How old?

A You know, whenever I went to the penitentiary the first time.

Q I didn't understand you.

A Whenever I went to the penitentiary the first time.

Q Are you talking about the oldest daughter of L.C. and Rosalie?

A Yes, sir. Her name is Rozella.

Q Did you ever get a whipping because of fighting with Rozella?

A Yes.

Q Is that what you call getting along good?

A No, sir.

Q All right. How often would you and Rozella fight?

A Oh, you know, we—not too often.

Q Were you fighting over the usual things that kids fight over when they are kids?

A No. We were young then. I used to try to tell her what to do and not to do.

Q You had to raise her?

A No, sir. You know, the things she was doing, I didn't like.

Q When you were little kids?

A Oh, no. I was grown then.

Q I was asking you about when you were a kid.

A Oh, no. We didn't have no trouble.

Q You never got a whipping because of fighting with her?

A No, sir. Not right then. You know, when we were young, no, sir.

Q You mean you got a whipping for fighting with her after you got out of the penitentiary?

A Yes, sir.

Q Who whipped you?

A Rosalie.

Q You mean Rosalie still whipped you after you got out of the penitentiary?

A Yes, sir. You know, she hit me. She just didn't whip me.

Q Now, how did you do in school?

A Well, I wasn't doing too good because I was playing hooky from school.

Q Do you remember where you were going to school at that time?

A Yes.

Q Where?

A Waldo Matthew High School.

Q Where?

A Waldo Matthew, M-a-t-t-h-e-w.

Q Did you ever get in a fight with anybody because you couldn't talk clearly?

A Oh, I had many occasions to fight.

Q What town did you have those fights in?

A Silsbee, Texas.

Q What school did you have the fights in?

A Waldo Matthews High School.

Q And where did you have the fights?

A On the school yards or maybe in the room.

Q All right. That is the school that you went to in Silsbee, Texas?

A Yes, sir.

Q That you are talking about. Right?

A Yes, sir.

Q Did you leave school or were you expelled from school?

A Leave.

Q All right. Do you recall ever being expelled from school?

A Yes, sir.

Q Why?

A Fighting.

Q Were you protecting yourself in those fights?

A Yes, sir.

Q You never did cause a fight, to your knowledge?

A Yes, sir, I remember causing—well, you know, we had a little gang, you know.

Q A game—

A Yes, sir.

Q Or gang?

A A gang, you know. I mean, you know, we stuck together.

Q Yes. So, you are talking about a gang and not a game?

A Yes, sir. A gang fight.

Q Gang fighting. But did you have these fights that I am asking about by yourself with another person?

A Oh, yes, sir, I have.

Q You also got off into gang fights, too. Is that right?

A Yes, sir.

Q When is the first time you can ever remember stealing anything?

A I was young. I don't remember. I was young, though.

Q Well, were you in elementary school or before school?

A About in the fifth or sixth.

Q Do you recall yourself as a good child or a bad child?

A Good child.

Q Up to when?

A Until I got with bad company.

Q Are you saying that all of your trouble sprang from being around bad company?

A Yes, sir.

Q Nobody to blame but them. Is that correct?

A Yes, sir. My job, yes, sir.

Q As a child.

A Yes, sir.

Q You weren't in any gangs, around bad company when you were at home at Rosalie's, before you started to school, were you?

A No, sir. I just started after I moved to Silsbee. When I got up in age on Bonnie Street. I remember that on Bonnie Street.

Q What street?

A Bonnie. B-o-n-n-i-e.

Q And my question is, did you ever cause any of these one on one fights yourself?

A I can't remember.

Q All right. How long were you out of school—let me ask you this: Did you ever

get in trouble with the law enforcement officers before you quit school?

A Yes, sir.

Q What kind of trouble did you get into?

A Well, my mother put me in jail. Not her. My aunt that I call momma.

I remember me and my sister, we ran off from home. Well, I had a bag and I headed for home with my daddy before he died. And I lived with him in Silsbee and Liberty when I was young.

Q Would you run off from Rosalie's house to see your father? Is that what you are saying?

A Yes, sir. She would be talking about whipping me and I would leave.

Q Well, did she talk about whipping you few times or often when you were a kid?

A Often.

Q Did she whip you a few times or often when you were a kid?

A Yes, sir.

Q Which?

A Often.

Q Why did she whip you?

A Fighting and getting—I wasn't doing nothing in school and playing hooky from school and things like that.

Q And Rosalie Modden was trying to make you do right?

A Yes, sir.

Q Is that what you understand?

A Yes, sir.

Q And did you ever think about whether you were doing right or doing wrong during this period of time?

A Yes, sir.

Q And did you reach a decision as to whether you were doing right or wrong?

A Yes, sir.

Q What was your decision?

A The decision, the more I kept doing what I was doing—well, I was doing right, I thought. I didn't care, you know. I just thought I would run around with the big boys. I never did run with nobody my age when I was young. I always run with people older than me. I always did do that.

Q You always ran with people older than you?

A Yes, sir.

Q When you were running around with those older people that you were younger than, who decided what to do?

A A dude named James Pollard.

Q James Pollard.

Tell us about James. Was he a nice fellow to you?

A No, sir.

Q Well, did he buy you candy or soda water?

A No, sir.

Q Did he buy you bear claws?

A No, sir.

Q Did he get you in the picture show?

A No, sir.

Q Did he take you to church?

A No, sir.

Q Did he tell you what you all were going to do?

A Yes, sir.

Q Did he decide whether you all were going out running around or not?

A Yes, sir.

Q Did you ever just do something on your own?

A Yes, sir.

Q What?

A Robbery.

Q As a child?

A Oh, no.

Q Did you ever do anything on your own besides robbery?

A No, sir. Well, not really. Mostly me and that dude would be together.

Q As a child—

A Yes, sir.

Q —Willie Mack—

A Yes, sir.

Q —did you ever do anything, that you can remember, just because you wanted to do it?

A Yes, sir. I usually take my sister and them money.

Q You used to take your sister money?

A Yes, sir. My step-sister.
 Well, my cousin. I call her my sister.

Q That is the oldest sister?

A Yes. My auntie's daughter. I call her sister. I call them sister and brother.

Q Rozella?

A Yes, sir.

Q You took Rozella money?

A Yes, sir.

Q Where did you get the money to take to Rozella?

A Where I get the money?

Q Yes.

A No. I used to take their money.

Q You used to take their money?

A Yes.

Q Did you ever do anything like taking flowers to Rosalie?

A Yes, sir. I bought her a lot of things.

Q Did you ever, as a child, just go along the side of the road and see a pretty flower and take it to Rosalie?

A No, sir.

Q Did you ever do anything for Rosalie?

A Oh, yes, sir.

Q What that was nice?

A Oh, me and this broad I was married to—

Q I can't hear you.

A You talking about when I was a kid or grown?

Q As a child.

A No, sir. Not when I was young, no, sir. I can't recall.

Q If you can recall it, can you remember who it was that gave you most of the whippings you got as a child?

A Rosalie Modden.

Q And that is momma? Even though she is not your momma, that is who you call momma, isn't it?

A Yes, sir.

Q And did you ever—were you ever able to understand as a child that she was trying to do right?

A Yes, sir, because she was a Christian woman, and a respected lady.

Q Did you ever—were you ever able to realize as a child that she was trying to help you to become a better person?

A Yes, sir.

Q And did she do it by any other way than—Did she ever fuss at you?

A Yes, sir.

Q Did she ever talk to you?

A Yes, sir.

Q And did she ever whip you?

A Yes, sir.

Q Did she ever whip you with a switch?

A No, sir.

Q Did she ever whip you with anything that you would think is less than a switch? Do you ever remember her spanking you?

A Extension cord; something like that.

Q Well, you can think of an extension cord. Can you think of anything else that she whipped you with as a child?

A No, sir.

Q All right. What was her husband's name?

A L.C. Modden.

Q Was L.C. Modden living in that house where you were living—

A Yes, sir.

Q with Rosalie and their children all that time?

A Yes, sir.

Q And did he work regular—

A Yes, sir.

Q when he had a job?

A Yes, sir.

Q To your knowledge, does he work now?

A No, sir. He had been in the hospital for about twelve or thirteen years, I think, for TB.

Q Is he home now?

A Yes, sir.

Q To your knowledge?

A Yes, sir.

Q All right. Did Rosalie feed you?

A Yes, sir.

Q And did she wash your clothes?

A Yes, sir.

Q Did she wash her children's clothes?

A Yes, sir.

Q Did she whip her children?

A Yes, sir.

Q Did she show love to her children?

A Yes, sir.

Q Did she show love to you?

A Yes, sir.

Q And you're satisfied that she loves you?

A Yes, sir.

Q Right?

A Yes, sir.

Q Now, did those children that you were raised with show you love?

A Well, yes, sir.

Q And did they ever mention that you weren't really one of them?

A Yes, sir.

Q Who would do that?

A All of them did it.

Q All of them?

A Yes, sir.

Q How would they tell you?

A "You really ain't, you know, my brother. You're just my cousin."

You know, it didn't hardly upset me none because I been around so long.

Q Had you been around long when you were back there as a little child?

A Yes, sir.

Q You had been?

A Repeat that again.

Q Yes, sir. Back when you were a child, was that when they were telling you that you were just a cousin; you really weren't one of them?

A No. I got up in age. About twelve or thirteen years old.

 

Q Before they ever mentioned that to you?

A Yes, sir.

Well, I know all the time I wasn't, you know, their brother.

Q All right. So, up until you're about twelve or thirteen, they just dealt with you just like you were one of them. Is that right?

A Yes, sir.

Q Now, have any one of those children, to your knowledge, gotten in trouble with the law?

A No, not that I knows of, no, sir.

Q To your knowledge, are they out and about and good citizens?

A Yes, sir.

Q And to your knowledge, were you ever intentionally hurt by L.C. Modden or Rosalie Modden intentionally, just for the sake of hurting you?

A Depending on what you are talking about.

Q Well, then, what are you talking about?

A Well, whipping me or what?

Q Did any—did Rosalie or L.C. Modden, from your point of view, ever do anything intentionally to hurt you, except to discipline you—

A No, sir.

Q —for something that you had done?

A No, sir.

Q All right. Did you understand or did you not understand why you got a whipping every time you got a whipping?

A Yes, sir.

Q You understood it?

A Yes, sir.

Q You understood it real clear.

Did you ever understand how to stop getting those whippings?

A Yes, sir.

Q But when did those whippings cease? Do you know what "cease" means?

A Yes, sir. When you—I mean you think about not doing this and that.

Q No. Cease means stop.

A Oh, stop.

Q When did you stop getting whippings?

A Well, you don't never get stopped from getting no whippings, no matter how old you is.

Q You don't stop getting whippings no matter how old you are?

A If you live under your people's roof, you don't.

Q All right. Does that people's roof include your neighborhood where you live, in the comfortable place you know, the jailhouse, the penitentiary? That is the kind of neighborhood, isn't it? That is where you are living, isn't it?

A Yes, sir.

Q From your point of view, you are just going to get a whipping regardless of what happens. Is that your understanding?

A Yes, sir. Whatever I do, yes, sir.

Q Whatever you do, how ever far you go, you are going to get a whipping.

And do you know of any way to stop from getting those whippings?

A Yes, sir. Be good. Behave.

Q Well,—

A Stop doing the things I was doing.

Q That was as a child, Willie Mack.

And you are certainly not telling this jury that whippings would have stopped you from getting to the penitentiary for robbing, are you?

A Yes, sir.

Q You think if somebody had come in and whipped you, then you would not have robbed that lady down in Silsbee?

A No. If somebody had stopped me, you know, that came to me before I did it.

Q Did it require somebody else to stop you from doing what you were doing there?

A Yes, sir.

Q That is back in Silsbee?

A Yes, sir.

Q Now, let's get to the more recent events.

Do you remember going to—all right. Do you want to tell us about how you got along with Mr. Patton?

What was your older friend there that you ran in that gang with?

A James Pollard.

Q Pollard?

A Yes, sir.

Q Okay. Where did you meet old James Pollard?

A At school.

Q How old was he?

A Oh, about fourteen.

Q How old were you, Willie Mack?

A About eleven or twelve.

Q Back then, that seems like he was a lot older than you, didn't it?

A Yes, sir.

Q Well, how did you meet Pollard?

A Well, on the school yard. Me, James Pollard, R.C. Davis, Poo Davis, Rocko Davis, Jerry Jedd, Jimmy Jedd and Jerry Wilson. Oh, there was a lot—there was a lot of us together.

Q That's a lot of people from your childhood. How can you remember so many people?

A Because we lived right around each other in that neighborhood.

Q And you were close to them, weren't you?

A Yes, sir.

Q Will you tell us what Pollard did in your group and what you did in the group?

A Well, we burglarized a store.

Q Is that the first case you made?

A Yes, sir.

Q How old were you then, Willie Mack?

A Sixteen. I had just turned—I was sixteen. I stayed in jail until seventeen.

Q Well, was Pollard there at that operation?

A Yes, sir.

Q That burglary?

A Yes, sir.

Q Did Pollard get to go to jail?

A No, sir.

Q He didn't?

What happened to Pollard because of his going with you to burglarize that store?

A I would not give him up.

Q Pardon me?

A I would not give him up.

Q You would not give him up?

A No, sir. He and the others.

Q Is that what you said, is what I am asking you?

A Yes, sir.

Q Well, being protective of him, weren't you?

A What you mean?

Q Well, you didn't give him up?

A No. I ain't going to do that.

Q All right. You sheltered him, didn't you?

A Yes, sir.

Q Did Pollard ever step up and take responsibility for being in on that operation with you?

A No, sir.

Q Do you know where Pollard is now?

A Sir?

Q Do you know where Pollard is now? The last time you heard of him, where was he?

A Penitentiary.

Q How many times had he been to the penitentiary?

A I can't count them.

Q Do you really know?

A No, sir.

Q All right. Did Pollard go to the penitentiary from Silsbee?

A I don't know.

Q Did Pollard go to the penitentiary before you?

A No, sir.

Q You went to the penitentiary?

A Yes, sir.

Q All right. Were there some other people that were running with Pollard and you—

A Yes, sir.

Q even on the burglary of that store?

A Yes, sir.

Q Did any of these people get caught?

A No, sir.

Q And did any of them get punished for what they did?

A No, sir, because I wouldn't tell it.

Q All right. And did you ever feel, back when you were a child, that it would be good to have somebody on your side there in Rosalie and L.C. Modden's house?

A Yes, sir.

Q Did you ever have anybody on your side back when you were a little kid; a cousin in the L. C.—Rosalie Modden home with six other kids?

A Yes, sir. I had some kin folks on my side.

Q Were they grown people?

A Yes, sir, but she dead.

Q Are we talking about the little kids?

A Oh, no. I really—no.

Q Well, when you all would get in fights as kids, did you have anybody that would take your side?

A Oh, yes, sir. Effram Edwards. He is dead now.

Q How old was he when he died?

A I don't know. I wasn't—I was in the penitentiary when he died.

Q All right, sir. Let me ask you this: When you were a child, how did Rosalie and L.C. Modden issue out their punishment to you all kids? Were they fair to you?

A Oh, yes, sir.

Q And in being fair, if there's two of you all fighting, both of you get the same kind of punishment?

A Yes, sir. If I was wrong, I get the whipping. If I was right, she get the whipping or he.

Q When the two of y'all kids were fighting, neither one was in the right, neither one was in the wrong, was there?

A Yes, sir.

Q In that situation, would both of you get a whipping?

A Yes, sir.

Q You're not even trying to tell this jury that Mr. and Mrs. Modden that raised you treated you any differently?

MR. GOODWIN: I object. That is leading and suggestive.

THE WITNESS: No, sir.

THE COURT: Sustained.

THE WITNESS: They treated me like they treated—

THE COURT: Excuse me. When one of the lawyers stands, it means he is going to make an objection. If you will, let me rule on the objection before you answer. If I sustain it, that means you can't answer the question. If I overrule it, it means you can.

THE WITNESS: Yes, sir.

THE COURT: Ask your next question.

MR. ASKINS: Thank you.

Q (By Mr. Askins) Now, did you have any other friend to you that was like Pollard?

A Jerry Angel.

Q Where was that?

A In Silsbee.

Q When was that?

A We were teenagers then.

Q Well, was that before Pollard or after Pollard?

A That was before Pollard.

Q Well, tell this jury about you and— what's his name?

A Jerry Angel.

Q Were you and Jerry the same age?

A No. I think he's about two years or three years older than me.

Q Was that while you were still going to school?

A Yes, sir.

Q How old were you then?

A I was about fourteen, thirteen or fourteen.

Q Well, was that at or near the same time you met Pollard?

A Yes, sir. Almost.

Q Was that—excuse me. Is that right?

A Yes, sir.

Q Were they both about the same age; older than you?

A Yes, sir.

Q And tell us about you and Jerry Angel. What did you all do?

A Oh, we was—you know, we used to go in the store and pick up, you know, something we want.

Q What do you mean pick it up? You mean steal it?

A Yes, sir, steal it.

Q Shoplifting?

A Yes, sir. You can call it that.

Q Is that what you called it or you just called it picking stuff up?

A I just said stealing.

Q Stealing?

A Yes, sir.

Q All right, sir. Who taught you the difference between stealing and robbing?

A I can't recall on that right now.

Q Did you learn that as a child or did you learn that as a grown man?

A Grown man.

Q What was it that taught you that? Do you know?

A Well, I really don't know, but I hear people in the penitentiary talk about it.

Q Okay. After you went in that store and burglarized it with Pollard and the other boys, did you have—did you break into any other stores?

A Yes, sir.

Q Were you alone or by yourself or with somebody else?

A Me and James Pollard. I mean Dalsie Eason.

Q That was after the drug store?
 Where did you break into at this time that you are thinking about?

A A grocery store.

Q Did you get caught?

A No, sir.

Q Did you ever turn yourself in?

A No, sir.

Q Had you quit stealing stuff by then, just stealing stuff without breaking and entering or holding somebody up?

A Yes, sir, I stopped when they sent me to the penitentiary.

Q For stealing?

A Yes, sir.

Q And the first robbery you ever did, where was it?

A Silsbee.

Q Who decided—who brought up the idea of the breaking in and burglary of the store that you and Pollard went into?

A James Pollard.

Q Well, why didn't you just not go?

A I don't know.

Q You knew what you were doing, didn't you?

A Yes, sir.

Q You knew it wasn't your store, didn't you?

A No, sir. I knew it wasn't.

Q You knew it was not, didn't you?

A That's right.

Q That grocery store that you all broke into and stole from, did you know that was not your store?

A Yes, sir. I know it wasn't.

Q Did you know what you were doing when you did it?

A Yes, sir.

Q Did you go on in there anyhow?

A Yes, sir.

Q Who came up with the idea of breaking into that grocery store?

A I think Jerry Angel.

Q Well, make it simple. Was it you?

A No, sir. I was kind of a little nervous about stealing anyhow. Breaking in.

Q Why were you nervous about stealing anyhow?

A Because I—you know I realized, you know, that I ain't used to stealing.

Q Back then when you were a little child?

A Yes, sir.

Q And right up to the time you went into that grocery store?

A Yes, sir.

Q Did you ever steal anything from Rosalie?

A Oh, like nickels and dimes.

Q Where from?

A Out of her piggy bank or something.

Q Did you ever get into her purse?

A No, sir.

Q Did you ever get caught?

A Yes, sir.

Q Stealing her pennies and nickels out of the piggy bank?

A Yes, sir. For my friends.

Q For your friends?

A Yes, sir.

Q What happened to you when you got caught?

A I got a whipping.

Q Who gave you the whipping?

A Rosalie and L. C.

Q Both of them?

A Yes, sir. Sometimes.

Q I'm talking about for stealing from that purse. I mean the piggy bank at one time.

A Oh, Rosalie.

Q Well, what did L.C. catch you stealing and whip you for?

A The same thing.

Q The piggy bank?

Did you ever understand that the reason you were getting a whipping was because you were stealing?

A Yes, sir.

Q Do you think that might be what caused you to be a little bit nervous about breaking into somebody else's grocery store?

A Yes, sir.

Q If you will, Willie Mack, what did you go to the penitentiary for the first time?

A Burglary.

Q Where?

A Silsbee.

Q Tell us about how that burglary came down, just all of it.

A James Pollard.

Q Who all was with you?

A Me, James Pollard, Dalsie Eason.

Q How do you do that Dalsie Eason?

A Dalsie Eason.

Q Dalsie Eason?

A Yes, sir.

Q E-a-s-o-n?
 Anybody else?

A I can't remember all of that, really.

Q Where did you—when did you find out you all were going to do that burglary?

A I think about seven or eight o'clock that night. We all got—

Q What time did you do the burglary?

A Oh, about nine or ten because they had the police right across the street to the Dairy Queen and we went on and did that, but we had two persons watching us.

Q You had what?

A We had two persons outside watching us.

Q Were you watching?

A No, sir.

Q What were you supposed to do?

A Well, I took the lock off the back door.

Q Okay. Who decided that was the way to go into the building?

A I did. After we couldn't get in the front—we saw the law. We went around the back way and I saw the lock.

Q Well, who decided to go in the front way?

A James Pollard.

Q And while you all—where were you when you decided not to go in the front way?

A We were going in the front way until we saw the law across the street in front of the Dairy Queen. From the store, there is a Dairy Queen that you be crossing in front of.

Q And who decided not to go through the front with the police over there at the Dairy Queen?

A I did.

Q You did?

A Yes, sir.

Q So, you were looking out?

A Yes, sir.

Q You're not saying that James Pollard told you to look, were you?

A No, sir.

Q And who decided to go around to the back?

A I did. Me and Dalsie Eason.

Q Where was old James Pollard?

A He was with us.

Q Okay. But he wasn't touching that lock, was he?

A No, sir. I did it.

Q Did you know about things like fingerprints then?

A Yes, sir. Fingerprints? Oh, no, sir.

Q Fingerprints?

A No, sir.

Q You didn't?

A No, sir.

Q Did you find out about them after that?

A No, sir.

Q You still don't know anything about fingerprints?

A Right now I do.

Q Where did you learn about fingerprints?

A Penitentiary.

Q All right. Tell this jury, was that the burglary that you went to the penitentiary on?

A Yes, sir.

Q How long did you stay over at the penitentiary?

A Oh, about thirty months.

Q When was the next time—when—what did you do when you got out of the penitentiary?

A Went to work.

Q Where?

A In Silsbee at the hardwood mill in '69.

Q 69.

A Yes, sir.

Q That's Highway 69 South?

A No. That's—I was working in '69.

Q In 1969?

A Yes.

Q Do you remember when you went in the penitentiary?

A '66, I think.

THE COURT: Excuse me. Is this just as good as any place to break for lunch?

MR. ASKINS: Yes, Your Honor.

THE COURT: I assume you will have a number of other questions?

MR. ASKINS: Yes, Your Honor.

THE COURT: Ladies and gentlemen, we will take our noon recess at this time.

You are in recess until one-thirty. You are admonished that you are not to discuss this case among yourselves or with anyone else until after you've heard all the evidence and retired to consider your verdict.

You are in recess until one-thirty.

(A recess was taken at 12:00 P.M. until 1:30 P.M.)

BE IT REMEMBERED that the following came on for hearing before The Honorable David V. Wilson, Judge of the 217th District Court, Angelina County Courthouse, Lufkin, Texas, on the 30th day of January, 1985, commencing at 1:30 P.M., pursuant to recess heretofore taken.

P-R-O-C-E-E-D-I-N-G-S

THE COURT: Are there any matters we need to take up before we bring the jury back in?

MR. ASKINS: Yes, Your Honor. May we approach the bench?

THE COURT: You may.

MR. ASKINS: Your Honor, we are ready to call our witness list, if it please the Court, trying to eliminate those persons—

MR. MC FARLAND: Why don't we get the ones we want and dismiss all the rest of them?

MR. ASKINS: That will be fine.

We need to keep Rosalie Modden, who got in here about one o'clock, who has not been sworn in. Leroy McGrew, Linda McGrew, Lonnel and Evie Young and Joe Kartye.

THE COURT: Okay. Who does that exclude?

MR. ASKINS: That excludes Wilton—no. We didn't have him here. George Houston, Larry Garrett, Lee Edward Bouton, Arthur English. We subpoenaed him. He's never shown up, so he doesn't need to be excused. Joe Tomas. Did I give you Arthur English?

THE COURT: Yes.

MR. ASKINS: Bryan Freeman. And we would—I'm sorry. There's one on the list we need to keep, Paul Goforth.

MR. MC FARLAND: The rest of them can go.

THE COURT: Is Miss Modden in the courtroom? If you will, stand, please, Miss Modden, and raise your right hand.

(Miss Modden was duly sworn by the Court.)

THE COURT: You may be seated.

Would you advise in the hall George Houston, Larry Garrett, Lee Edward Bouton, Joe Tomas and Bryan Freeman that they may be excused.

THE BAILIFF: Yes.

THE COURT: Go ahead and get the jury in then.

THE BAILIFF: Yes, sir.

(The jury returned to the courtroom.)

THE COURT: Good afternoon, ladies and gentlemen. Prior to the noon recess, the defendant was testifying. If you will come back to the witness stand, please.

You may proceed.

MR. ASKINS: Thank you, Your Honor.

WILLIE MACK MODDEN

resumed the witness stand and testified further as follows.

DIRECT EXAMINATION
CONTINUED

QUESTIONS BY MR. ASKINS:

Q Mr. Modden—

A Yes, sir.

Q what was the nature of the first case that you went to the penitentiary for?

A Burglary.

Q Do you recall when that was?

A '66. I went to jail in '67, though. I mean '55, and stayed in jail until '66.

Q And then you went on to prison without being released from jail. Is that correct?

A Yes, sir.

Q And you were released, as I recall, thirty months later, as you recall?

A Yes, sir.

Q And then on your second trip to the penitentiary, when was that and what was it for?

A Burglary.

Q Where did the burglary occur?

A Diboll.

Q And who was involved in the burglary with you?

A Wilton Young and James—I mean Taylor. I forgot his last—his first name.

Q Is that Wilton Young the same Wilton Young that testified here in court with you?

A Yes.

Q I mean here in the courtroom yesterday?

A Yes, sir.

Q Was he ever arrested, tried or convicted of that offense?

A I don't believe so.

Q Did you ever tell the police that Wilton Young was involved in that case with you?

A No, sir.

Q Why not?

A Well, I feel like they give me—first, I won't tell on nobody. They got to get them before—in order to get me. As long as I do something and they get me, I will put all the weight on me.

Q Well—

A No matter who it would be.

Q Well, did you—did the other man go to the penitentiary?

A No, sir.

Q What was his name?

A Oh, his name is Philip Taylor.

Q Did Philip Taylor go to the penitentiary for that offense?

A No.

Q Did you tell on him?

A No, sir.

Q Why did you not tell on him?

A The same reason.

Q And Wilton Young is your uncle, is he not?

A Yes, sir.

Q And what kind of feelings do you have for the Young family generally?

A They are my people.

Q Has Wilton ever been in the penitentiary, to your knowledge?

A No, sir.

Q Now, on the robbery on the murder for which you have been found guilty—excuse me. Let's come to the next event you were in.

 What was the—what about the robbery down in Silsbee?

A What about it?

Q Did you have a robbery down in Silsbee?

A Yes, sir.

Q And was that the first or second time you went to the penitentiary?

A The third time.

Q The third time?

A Yes, sir.

Q The last time that you went to the penitentiary?

A Yes, sir.

Q All right. Who was involved in that offense with you?

A Myself.

Q You were by yourself on that one?

A Yes, sir.

Q And will you tell the jury what happened in that case?

Where did the robbery take place?

A In Silsbee.

Q Where in Silsbee?

A I think—I don't know. A 7–11 or what. All I know, a store.

Q All right. And do you know whether the victim in that robbery was a man or woman?

A A woman.

Q And what were you using, if anything, as a weapon on that robbery?

A A pistol.

Q And did you shoot that woman?

A No, sir.

Q Did you threaten that woman with that pistol?

A No, sir.

Q Did you ever point it at her?

A Yes, sir.

Q You don't consider that a threat?

A Yes, sir.

Q Do you feel like you threatened the woman?

A Yes, sir.

Q I'll put it this way: Do you feel threatened when a pistol is pointed at you?

A Yes, sir.

Q For example, did you feel threatened enough to cooperate completely when the lady deputy got you out from under that bed down at Kirbyville?

A Yes, sir.

Q Now, was there anybody that talked with you about that robbery down at Silsbee?

A No, sir.

Q Before you did it?

A No, sir.

Q How did you decide to do that robbery?

A Oh, I decided—I really can't tell you like it was.

Q Why not?

A I mean, I just robbed them.

Q Well, how long had you been carrying the pistol before you robbed it?

A For some time.

Q Everywhere you went?

A No, sir. No, sir. I always stashed it until I needed it.

Q You always what?

A I always hid it until I needed it.

Q You said "stashed", didn't you?

A Yes, sir.

Q Where did you get the pistol and take it with you before you did the robbery? I'm saying—

Let me ask you this way: When did you go get the pistol and carry it with you to go do that robbery?

A Repeat that again.

Q You had a pistol at the robbery. How long had you had it on your body before you did that robbery?

A I went and got it.

Q Why did you get the pistol, Willie Mack?

A To rob.

Q Did you already know what you were going to rob?

A Yes, sir.

Q Where was the gun hidden?

A Back behind my auntie's house.

Q What time of day or night was that?

A About nine or ten o'clock that night.

Q Okay. And you went and robbed that lady at that store, didn't you?

A Yes.

Q And did you—did you make her do anything other than give you the money from the cash register?

A Yes, sir, I did.

Q What was it?

A Made he pull off her clothes.

Q Did you make her pull off all of her clothes, Willie Mack?

A No, sir.

Q What clothes did she still have on when you stopped making her take her clothes off?

A Her brassiere and things.

Q Well, did she have her underpants on?

A Yes, sir.

Q Did she have a slip on?

A Yes, sir. White slip.

Q Did you let her leave it on?

A Yes, sir.

Q Did you have any ideas about making any sexual advances at her?

A No, sir. That ain't my bag.

Q Why did you make her take her clothes off, Willie Mack?

A So I could get away.

Q How did you figure having her take her clothes off would let you get away?

A Yes, sir.

Q How do you figure that?

A Give me enough time to get away.

Q Well, did you feel she would be embarrassed to go get help if that's all she had on?

A Yes, sir.

Q Where did you go from there?

A In the project.

Q How did you get to the store in the first place?

A Walked.

Q And how did you get away?

A Walked.

Q Did you walk or run?

A I ran.

Q Willie Mack, can you drive a car?

A No, sir.

Q Did you never learn how or you just don't drive?

A I don't know, and I don't know how.

Q Did you ever try to learn to drive a car?

A Yes, sir. And got a ticket.

Q Where was that?

A In Silsbee when we burglarized that store. I went and bought me a car of my own.

Q You bought it with stolen money, though, didn't you?

A Yes, sir.

Q How long did you keep that car?

A Oh, about two or three days.

Q And that is the length of time that you had that car then?

A Yes, sir.

Q Have you ever tried to drive or have anybody teach you how to drive a car?

A Yes, sir. I was working on a telephone company. You know, laying down cable in the ground, telephone cable.

Q Where?

A In Kountze.

Q All right. How old were you then?

A About twenty-two, twenty-three; somewheres in there. About twenty-two.

Q Then, when you got out of the penitentiary that time, based on that robbery of the lady who you made take her clothes off,—was that when you were sent to the penitentiary for twenty-five years?

A Yes, sir.

Q How long were you free after you had robbed that lady before you went into jail?

A About a month and a half.

Q What happened to you on the car? Was that before that?

Did you work anywhere during that month and a half time?

A Yes, sir.

Q Where did you work, Willie Mack?

A At Louisiana Pacific.

Q What were you doing there?

A Tailing the saw.

Q Tailing the saw?

A Yes, sir.

Q Does that mean pulling boards off as the saw went through the wood?

A Yes, sir.

Q What other work have you done on the outside before going to the penitentiary the first time—anytime before the first time or in between the two times you've been in the penitentiary?

A Laying down telephone cable, hauling a little pulpwood. That's all I remember.

Q When you were hauling pulpwood, who were you working for?

A I forgot that man's name. He lives down from my mother's house.

Q How did you learn to haul pulpwood?

A Well, you go out with—I forgot his name. He lives right down from my momma, too. I forgot his name. His wife is named Ernestine, though.

Q When you say "haul pulpwood", you don't mean literally haul it on the truck; you're talking about loading and unloading those big stacks of pulpwood, aren't you?

A Yes, sir. I would load it on there. I wouldn't unload them.

Q You would just load them on?

A Yes, sir.

Q When did you get out of the penitentiary the last time?

A '83.

Q Do you remember that it was before Christmas of '83?

A December the 15th. December 18th.

Q And you had gone in when?

A August, '74. August the twentieth-something, '74.

Q All right. While you were in the penitentiary,—well, let me try this: How old were you when you went in the penitentiary the first time?

A Seventeen, I think.

Q And how old were you last December when you got out?

A Thirty-six.

Q Seventeen—

A Oh, thirty-five.

Q Thirty-five?

A Yes, sir.

Q From age seventeen to age thirty-five, how many years have you been on the ground outside the penitentiary?

A I think about four years.

Q Except for hauling pulpwood and working on the Louisiana Pacific laying cable, before you came out of the peniten-

tiary the last time, what work have you done?

A Working at Mims Meat Company.

Q That was after you got out, wasn't it?

A This last time, yes, sir.

Q Okay. Let's just cover that.

You worked at Mims Packing Company after you got out of the penitentiary?

A Yes, sir.

Q When you got out of the penitentiary, where did you come this last time?

A Jessie Lee Young in Diboll.

Q All right. And you worked for Mims Packing Company when?

A A little before Christmas. About three days before Christmas.

Q When did you quit working for Mims?

A I can't remember. It was in '74. I mean '84.

Q So, it was sometime over in '84 when you left Mims?

A Yes, sir. In the summer time.

Q Do you know why you left Mims Packing Company?

A Oh, I was getting another job at Corrigans. I mean in Cameron.

Q In what kind of work?

A Working on the gluing machine at the mill.

Q What kind of machine?

A Gluing machine.

Q Glue. Oh, glue machine?

A Yes, sir.

Q Did you ever get that job?

A Yes, sir.

Q How long did you work at that job?

A Two days. Two nights, I mean.

Q What was your work at Mims Packing Company?

A Spreading out cow hides.

Q Spreading out cow hides?

A Yes, sir.

Q And have you worked anywhere else in any kind of work than that outside the penitentiary?

A I was working in Cameron.

Q What did you do for Cameron?

A That's at the sawmill. That's the glue machine.

Q Where?

A Cameron, Texas.

Q Camden, Texas—

A Yes, sir.

Q you're talking about.

That was after you got out of the penitentiary the last time?

A Yes, sir.

Q Let's go back now to the first time you were in the penitentiary, and you tell this jury whether or not you had any disciplinary reports placed against you in your pen packet while you were in the penitentiary?

A I couldn't—I don't understand what you are talking about.

Q All right. Did you lose any good time?

A Yes, sir. A whole lot.

Q What for?

A Fighting.

Q Was that the first time you were there?

A Yes, sir.

Q What were the fights about, Willie Mack?

A Well, I was told, you know, I was going to leave—"I come here like a man and I am leaving like a man."

Q What do you mean by that?

A They wanted to make a punk out of me.

Q Who tried to do that?

A I don't know the dude.

Q Well, were you successful in preserving your manhood?

A Yes, sir, I was successful.

Q And to your knowledge, did you ever lose it—

A No.

Q during any time you were in the penitentiary?

A No, sir.

Q That was one incident of fighting as regards the first time you were in the penitentiary.

Did you receive any other disciplinary reports for fighting? Did you lose anymore good time for fighting?

A Oh, yes, sir.

Q And was there any different reason for it than the reason you told us for this time now?

A Yes, sir.

Q Can you give us another instance of when you lost good time and why?

A Well, at that time, they had the lead row and the tell row. You know, they supposed to be tough guys.

Q Who were they?

A Lead row and the tell row.

Q Leroy and Tellrow?

A Yes, sir. Lead row and the tell row.

Q Oh, lead row and the tell row?

A Yes, sir. You know, they had the bad—you don't keep up, they want to jump you. If you get in the front of them, they want to jump you, you know. And this

dude and I—I know his last name. His last name is Thompson.

Q Are you talking about working in the field, Willie Mack?

A Yes, sir. I'm telling you about the fight.

Q That is what I wanted to ask you. Are you talking about the lead row and the front line of convicts?

A Yes, sir.

Q And the tell row is the back row?

A Yes, sir.

Q And anybody in any one of those rows is what, a tush hog?

A No. Them two.

Q Just those two in the line?

A Yes, sir.

Q Were you ever in either one of those lines, the lead line, the head line or the tail line?

A No, sir. I never did like it.

Q You were always in the middle?

A That's right.

Q Tell us how that fight came about?

A Well, this dude name Tom, he was the lead row and this dude named Tone—I forgot the other dude's name. And me, dude named Paul Johnson and Eddie Bray—in the morning time, you know, lead row and tell row, they start running up and down their rows, you know, so we got—

Q Who is "we"?

A Me, Eddie Bray and Paul Johnson.

Q Okay.

A And we got hit where we got his turn when they started running. They don't want to run in the evening time because they be too tired. We rested up in the morning time and let them run, and in the evening time we start running up and

down the rows. And so he told us to slow down. I told him, "No. You run this morning. Let's run today," you know.

I said, "I ain't tired."

So he came up there and hit me and I swung the agate at him and missed him.

Q You did what?

A An agate, a hoe.

And I missed him. And they took the hoe from me. And I hit him up side the head and he fell and I started stomping him.

Q All right. Did you get tried in a court of law for that matter?

A No, sir. They took—

Q That was handled inside the prison, wasn't it?

A Sir?

Q You lost your good time on that, didn't you?

A Yes, sir.

Q So, you never were taken out of the prison for that matter to be handled?

A No, sir.

Q Did you ever—can you think of another situation where you lost good time during the first time you were at the penitentiary?

A The first time?

Q Yes.

A Oh, yes, sir. I hit a dude in the head with a can.

Q Why?

A He was trying to make a punk out of me. I show him I was a man. I ain't no punk.

Q All right. Do you have another incident that you can tell us?

A That's the only one I know the first time.

Q Then the second time, what?

A A dude named Comb, C-o-m-b, Comb—I forgot the other dude's name.

Well, we were playing dominoes that night. And I don't know his name. He came and asked me about didn't I tell him something about—did I tell Comb about him. It come out, you know, Comb went and told him that I say he were a punk. I told, you know, Comb I didn't know, you know, but Comb went back and told him a lie about I said it. So, we were playing double blank for—

Q You were playing what?

A Double blank.

Q What is double drank?

A Double blank. Dominoes.

MR. MC FARLAND: Double blank.

Q (By Mr. Askins) Double blank?

A Yes, sir.

Playing for, whoever has the most in their hand, drinks a jug of water. That's what we were playing.

So, he came—the dude, what I don't know his name, he came over there and told me he wanted to talk to me. He had a knife about that long. I didn't know he had it between his legs. So, he asked me about it. He said, "Did you tell Comb anything about me?"

I said, "No."

I said, "Where he at?"

So, he went and got Comb and Comb couldn't tell him like it was, so he stabbed Comb instead of me. And they locked me up for that about six months because I refused not to—

Q Go ahead. I'm sorry.

A I had refused not to go back to work for something I didn't do.

Q Well, when you say they locked you up, that means you were taken off the work detail or what?

A Yes, sir. Good time taken.

Q Were you put in solitary for that?

A Yes, sir.

Q Is that solitary confinement?

A Yes, sir. For fourteen days.

Q Yes, sir. Now, did you ever get in—do you have any other situations where you had a fight while you were in the penitentiary?

A Yes, sir.

Q What happened?

A Well, I can't call this dude's name, but he always, you know, talked bull corn with me about the way I talked. I told him—

Q What do you mean by the way you talk?

A Yes, sir, the way I talk.

Q All right.

A You know, he be mocking me all the time and everybody be laughing. I get mad, so I went up side his head.

Q You went up side of his head with what?

A My hand.

Q All right. Was that the end of that fight?

A Yes, sir.

Q And did you lose good time for that?

A Yes, sir.

Q And is that the last instance you can recall having trouble with other inmates, where you were given a disciplinary report or lost good time?

A Oh, yes. We were working in the kitchen. I was working in the kitchen.

Q Was this a fight?

A Oh, no.

Q All right. Let me ask you a different question then.

Did you have any trouble by not following the directions of whoever was in charge of you in the penitentiary?

A Oh, no, sir. No, sir.

Q Well, if you feel you did not, will you then tell us about this incident in the kitchen.

A Well, I was working in the dish room.

Q Yes, sir.

A And, you know, it was hot in there. And we wanted some ice that day because we always keep ice, where we were stealing ice.

Q From where?

A Out of the kitchen. Back in the back.

Q Yes, sir.

A I was the lookout man.

Q Yes, sir.

A And my partner, he will go get a big old block of ice.

Q Yes, sir.

Q And we carried it in the dish room and locked the door and made sure nobody can't come in there. And that day they wouldn't give us none. We went and got to steal it, but we couldn't find none. We went to the ice house, and wasn't none in there.

Q Who is washing dished while y'all were out trying to steal—

A We weren't washing right then.

Q I see.

A So we see we couldn't get no ice, so they started putting trays through the little pan hole. We just let them pile up. And they asked what was wrong, and we told them we needed some ice. It was hot

in here. They told us to go to work. So all of us said, "We ain't going to work."

But on the end, I got all that fault on me.

Q Do you ever remember making any remarks to the guards while you were working out in the field?

A Yes, sir. Oh, yes, sir.

Q Did you ever lose good time for that?

A Yes, sir.

Q Will you tell the jury what happened in one of those?

A Well, this guard, he is from Alabama. Mr.—do I have to tell it like it is?

Q Clean up the language if you want to, but go ahead and tell it like it is, yes, sir.

A Well, he told me my momma should have died when she had me.

Q All right.

A That's when I wait until he got to the back gate and I jumped him.

Q Jumped what?

A Jumped the guard.

Q Oh, you jumped the guard?

A Yes, sir.

Q Did you hit the guard?

A Yes, sir.

Q What happened to you as a result of doing that?

A They whipped me, locked me up.

Q Who whipped you?

A The warden and them.

Q How did they whip you?

A I don't know his name, but they call him Big Foot. I don't know his name. He hit me with one of his shoes. And they beat me in the stomach. And I had to go—when I got out of solitary, about twenty-something days, they had to rush me to the hospital. My stomach was messed up. So, I went to work that day on a Friday. I went to work that Friday evening and that Friday evening when I got off work, they had to rush me to the hospital.

Q But you knew better than to jump a guard, didn't you?

A Yes, sir.

Q Why would you jump the guard?

A Because I didn't like what he said about my momma.

Q All right. Were you ever—did you ever lose good time for talking bad language on the work line?

A Oh, no, sir.

Q You never cussed anybody on the work line?

A Oh, yes, sir.

Q All right, sir. You cussed somebody on the work line, didn't you?

A Yes, sir. Depending on who you talking about.

Q Well, who did you cuss on the work line, where you had—where you got—where you lost good time?

A You talking about inmates or guards?

Q Either way where you lost good time.

A Inmates.

Q Did you lose good time because of that?

A Yes, sir. Fighting.

Q Did you—sir?

A We had a fight when I cussed them out.

Q All right. Can you think of any other incidents you did while over there where you lost good time?

A Yes, sir.

Q Tell the jury what it was.

A Well, also, now, you know, most people call them guards. I call them officers.

Q Yes, sir.

A The officers over there kept harassing me.

Q Did what to you?

MR. MC FARLAND: Harassing him.

THE WITNESS: Well, I don't want to use that word.

Q (By Mr. Askins) Was he harassing you?

A Yes, sir.

Q Harassing you?

A Yes, sir, harassing.

Q All right.

A I got tired of it. He threw my hat way across the field. I sit down. I say, "I ain't going to do—", I ain't going to say what I said. I just said, "I ain't going to do no more work."

I told him if he wanted to do—if he wanted anymore work to do, he can get off the horse and do it his self.

Q He didn't do that, did he?

A No, sir.

Q Did you lose good time because of that remark—

A Yes, sir.

Q —and sitting down in the field?

A Yes, sir.

Q Did you ever have occasion to cut anybody while you were in the penitentiary?

A Yes, sir.

Q Will you tell the jury—one or more times?

A One time.

Q Will you tell the jury about that, please.

A Me and a dude got into it one Saturday—one Saturday, one Saturday evening. I don't know who the—I know the dude I cut, but I don't know the dude that was agitating and told him that I say somebody's momma and me and—Jerry. That is the one I cut. And we were tight partners. And we were listening at a football game. I won't ever forget that evening. And he walked up behind me. I still got that scar right here now. He hit me right here, and I fell and he kicked me in my side. And they stopped—they stopped us and I had blood all over my face. And BT, that means Building Attendant. The Building Attendant rushed me in the shower—I mean in the wash room and washed the blood off of me and told me, "Don't say nothing about it to the Warden now."

I said, "Okay."

But I had made up my mind I was going to do something to him, you know, so I went in my cell and got me two razor—four razor blades and a toothbrush, and I burned that toothbrush so they would melt to that razor blade, so that Sunday morning when I went to breakfast, a partner of mine named John Richards told me that my brother was locked up in solitary. So, he was over there with me. I asked, "For what?"

He say he was in the cell for Christmas and he ain't supposed to come out of his cell for fourteen days. He was in the cell for Christmas for fourteen days, so he came out himself, so I said, "Well,"—

Q Did you cut the other man that hit you?

A That's what I'm fixing to tell you.

Q Yes, sir, but please tell me.

A So, we went to chow that Sunday morning, around about eight o'clock.

Q Yes, sir.

A I waited until the dude put some soap in his face, on his face and eyes, and I went up to him and cut him up here.

Q On the side of his neck?

A Yes, sir.

Q All right. And did you lose good time for that?

A Yes, sir.

Q Was there anything that you ever did while in the penitentiary that caused you to be taken from that penitentiary and tried in a court of law?

A No, sir.

Q Now, I think we should ask you about the most important thing that we are here for.

Now, Mr. Modden, have you ever raised the point at anytime since it became clear to you that you were innocent of the killing of Deborah Davenport?

A Repeat that again.

Q Have you always said in truth that you killed Deborah Davenport?

A Yes, sir. Yes, sir.

Q Did you know—well, will you tell us why you killed Deborah Davenport?

A Because I wanted no witness.

Q Pardon me?

A I didn't want no witness.

Q Where did you get the idea of not leaving a witness, Willie Mack?

A I been around a lot of dudes in the penitentiary. They been talking about them gangsters, you know.

Q Gangsters?

A Yes, sir.

Q Yes, sir.

A And, you know, I been hearing how they been doing this and that and robbing and things.

Q On June the 9th—July the 9th of 1984, were you involved in another robbery of a Jif–E Mart Store?

A Now, you got me messed. Which one are you talking about?

Q The first one.

A Yes.

Q All right, sir. And was that here in Lufkin, Texas?

A Yes, sir.

Q Who was with you on that occasion, in truth, only the truth, but all of the truth?

A Do I say it?

Q You tell the truth, whatever it is?

A Leroy McGrew and Mr. T.

Q Who is Mr. T?

Was that a man that you were introduced to as Lawrence—

A Lawrence Wyatt.

Q Lawrence Wyatt?

A Wyatt. I can't pronounce that name.

Q All right. Regardless of that, where did you meet Leroy McGrew?

A Well, where I meet him?

Q I say when did you meet Leroy McGrew, the first time ever?

A Oh, over at his house when he was staying there in the apartment. I don't know what the name of them apartments, though.

Q Well, when did you meet Leroy McGrew?

A I think '84.

Q It was after you got out of the penitentiary, wasn't it, Willie Mack?

A Yes, sir.

Q This last time?

A Yes, sir.

Q And how—did you have occasion to see Leroy McGrew often or seldom?

Do you know what seldom means? Did you see him a lot or a little?

A Oh. Not at the particular time when he was staying over there. I didn't hardly see him that much until he moved on Culverhouse. Over on Culverhouse I seen him most of the time.

Q Do you remember when it was? Was it the spring or summer?

A Well, it was winter time when I met— when he was staying in the apartments.

Q And did you get with Leroy any after you met him at that apartment?

A Yes, sir.

Q Where?

A Over to his house. Then we went over to my auntie's house.

Q Who?

A Roosevelt.

Q I'm not talking about July the 29th.

A No, me neither.

Q Then when?

A When Roosevelt was living right there—they was living in the same apartments. I mean the same area as Leroy.

We went over there and sit around and drank some beer.

Q All right. And that was in the winter time?

A No. It was summer.

Q Summer time.

And when was the first time before that, that you remember seeing Leroy McGrew or being with him, more important?

A I can't really can't remember.

Q You said you met him sometime in the winter. Did you see him from the time you met him in the winter until that time you went over to Roosevelt's house, drinking beer with him?

A That's the time I saw him, I think the second time.

Q All right. Was that when you were introduced?

A No. I was introduced the first time.

Q Okay. Where was the first time? Was that over at the apartment where he was living?

A Yes, sir.

Q Who introduced you to him?

A Roosevelt Young.

Q Roosevelt Young any kin to you?

A Yes, sir.

Q What is he?

A Uncle.

Q Is he Wilt's brother, too?

A Yes, sir.

Q Was Leroy working at the time?

A I don't know. That particular time, I don't know

Q Were you working at the time?

A Yes, sir. At Mims.

Q Do you remember when you worked at Mims?

A Yes, sir.

Q When did you work at Mims?

A December. About December the first or somewhere up in there.

Q And that is about when you finished working at Mims?

A Oh, no.

Q When did you quit working at Mims?

A Well, I don't know. I think it was in the summer time.

Q All right. Sometime while you were working for Mims, then, you met Leroy or Roach McGrew?

A Yes, sir.

Q And how long was that before you all went to do the first robbery?

A It was a pretty good while.

Q Did you do anything else illegal with Leroy or Roach before the first robbery?

A No, sir.

Q Do you remember anything about any air conditioners?

A Yes, sir.

Q All right. When—or what is this about the air conditioners, please, sir?

A Say that again.

Q Were you involved with Leroy in stealing some air conditioners or not?

A No, sir. Not with him.

Q You weren't?

A No, sir.

Q Who were you with?

A Mr. T.

Q Mr. who?

A Mr. T.

Q Names Lawrence Wyatt?

A Yes, sir.

Q Is that true?

A Yes, sir.

Q All right. You never stole any air conditioners with Leroy?

A No, sir.

Q Did you ever steal anything else with Leroy before you went to the Jif–E Mart and robbed it on July the 9th, 1984?

A Yes, sir.

Q Well, did you answer me "yes" because you didn't understand what I said?

A Say that again.

Q All right. Did you steal anything with Leroy McGrew before you did—

A No, sir.

Q —the first robbery?

A No, sir.

Q All right. Did you steal anything with anybody else other than Lawrence Wyatt?

A No, sir.

Q When did you steal anything with Lawrence Wyatt?

A I forgot when, what night it was.

Q Was it before or after the Jif–E Mart robbery?

A Before.

Q What kind of car were you in that night?

A Brown Cadillac.

Q Whose car was it?

A Mr. T.

Q Do you ever drive?

A I can't drive.

Q Who came up with that idea of stealing the air conditioners?

A He did.

Q Why did you go with him?

A Make me a little money.

Q Does stealing seem natural to you?

A What you mean?

Q Is it usual for you to steal?

A For me to steal?

Q Yes, sir.

A Not occasionally, no.

Q Well, what did you do? When you went, tell us what you did, you and Mr. Wyatt?

A I helped him tote the air conditioners in the car.

Q All right. Who took—what kind of air conditioner was it?

A I don't know.

Q Well, I mean was it a central air conditioning unit or was it a window unit?

A Window.

Q Did you take it—was it sitting in a box or out in the open? Where was it?

A I really don't know. It was in the window. I don't know.

Q I mean was it in the window like a window unit?

A Sitting in the window.

Q Who unplugged it?

A I guess he did.

Q Were you there?

A No, sir. I was, you know, I was out front by the car.

Q All right. What did you all do with that air conditioner?

A Well, I don't know what he did with it, but we went—

Q Did you load it in the car?

A Yes, sir. Oh, yes, I know. We went to the house, carried it to the house.

Q Whose house?

A Mr. T.

Q All right. Did you unload it from the car?

A Yes, sir.

Q Do you know what actually happened with that air conditioner after that?

A No, but—

Q Did you receive any money—did you receive any money from—

A Yes, sir.

Q —Mr. T. for helping with that set?

A Yes, sir.

Q How much?

A I think thirty-five, $40.00.

Q Do you know where the money came from?

A No, sir, but—

Q If you don't—go ahead. I'm sorry.

A Well, we went to this store. He got him a long envelope at this store, a brown envelope.

THE COURT: Repeat your answer.

THE WITNESS: About two days after, you know, Red did it. About two days.

Q (By Mr. Askins) Well, how did you get back with Mr. T. on that occasion to get that money?

A On the Front. I was walking on the Front, and he stopped and seen me.

Q Was it daytime or night time?

A Day.

Q And you went with him where?

A I forgot the store name.

Q Well, did you go someplace with him? Was it a store?

A I guess it is a store.

Q Is it—

A I never been inside.

Q You didn't go inside the store?

A No, sir.

Q Did you get in the car with Mr. T.—

A Yes, sir.

Q —two days after y'all stole that air conditioner?

A Yes, sir.

Q Did you go to some store in Mr. T's car?

A Yes, sir.

Q You don't know where the store was?

A I know where it is, but I don't know the, you know—it's on 94. I think that's where it is.

Q On Highway 94?

A Yes.

Q All right. And did Mr. T. get out of the car at the store at 94?

A Yes, sir.

Q Did he have anything in his hands when he was walking into the store?

A No, sir.

Q Did he have anything in his hands when we was walking out of the store?

A Yes, sir. A long brown envelope.

Q Did you see what was inside the long brown envelope?

A Money.

Q Did you get any of that money?

A Yes, sir.

Q Was that where you got that money you told us about already?

A Yes, sir.

Q Okay. Willie Mack, where were the plans made to do the first robbery?

A Over at Roach's house.

Q That is Leroy McGrew. Right?

A Yes, sir.

Q You heard his wife testify yesterday, didn't you?

A Yes.

Q Is that the same Leroy McGrew that testified yesterday? I mean that—was that the Linda McGrew that testified yesterday, Leroy McGrew's wife?

A Yes, sir.

Q Same lady that was here yesterday?

A Yes, sir.

Q Okay. When you went over to Leroy's house to plan that first robbery, who was there or who got there with you and Leroy, and who planned that robbery?

A Repeat that again.

Q How did you get to Leroy's house?

A Walked.

Q Was Leroy there?

A Yes, sir.

Q Was anybody else there?

A Linda and her kids.

Q And did anybody else come up to work with you all to plan that robbery?

A No, not right then.

Q All right. Who brought it up, that there was going to be a robbery?

A Leroy.

Q Well, how did Leroy bring it up?

A He told me he know where a store is; a good store we can hit.

Q Well, did you go along with him on that idea?

A Yes, sir.

Q And who worked out when you were going to do it and how you were going to do it? Did you work with him on that plan?

A Yes, sir.

Q How did you work it out with him?

A You talking about going in the store or what?

Q Well, going in the store, how to get there—

A No. I didn't. He was the one.

Q —how to leave?

A He was the one that furnished all that. He is the one—he caught some dude in a blue car. I don't know where they went. He was looking for a pistol or something; that guy get one for him or

something. He couldn't find none. So, when I look up again, he had Mr. T. He was in the car with Mr. T.

I was standing across the street from the Front, under the shed when he picked me up.

Q And I take it you had already left Leroy McGrew's house and had gone up to the Front?

A Yes, sir.

Q And whose car was Mr. T. in?

A His car.

Q Whose car—well, whose car was Leroy in?

A Mr. T's.

Q And was anybody there that saw you get with them that evening?

A George Houston and somebody else. I forgot.

Q Okay. Is that the same George Houston that testified here yesterday?

A Yes, sir.

Q Do you remember George Houston telling you whether or not you should get in that car or not?

A Yes, sir.

Q What was George Houston's advice to you?

A Told me don't get in the car because Leroy is bad company. He'll get me in trouble. And Leroy told me to come on.

Q Had you been in any trouble up to that time?

A No, sir.

Q Well, had you gone to steal that air conditioner with Mr. T. by that time?

A Yes, sir, but that—you know, it wasn't nothing to me.

Q And what time of day or night was that?

A What?

Q That you got in the car with Leroy and Mr. T.?

A I really don't know. It was late.

Q All right. What time was it then that you had been at Leroy's and you all had decided to do the robbery?

A Repeat that again.

Q You got on the Front and they picked you up.

A Yes, sir.

Q How much time before that was it that you had been over to Leroy's, working out that you were going to rob that first store?

A Oh, we been—I was over there for a good while, sitting down with them.

Q Do you remember what time it had been when you got to Leroy's house?

A It was in the evening time.

Q Okay. Had you had anything to drink that day?

A No, sir.

Q Had you had anything to drink that night before you went to rob the Jif–E Mart store?

A That first store?

Q The first store?

A No, sir.

Q All right. Let me ask you this: When you went to the penitentiary the first time,—going back to that time in your life, did you drink?

A No, sir.

Q When was the first time you had any beer, gin or vodka or anything else to drink?

A The second time.

Q The second time what?

 

A When I got out of the penitentiary.

Q And how much did you drink?

A Not too often.

Q Had you been drinking at the time you robbed that lady, where you made her take her outer clothes off?

A No, sir.

Q All right, sir.

A I don't drink that much, you know. When I was in Silsbee, I never did hardly drink, really, you know.

Q Would your same answer apply, that you just gave, that you got back here from the penitentiary the last time, down in Diboll—have you had—since you got out of the penitentiary the last time, have you drunk a lot or a little bit?

A Well, I drink more this time than I did the other times.

Q What did you drink?

A Beer. Sometimes a little vodka or gin, but mostly beer. Schlitz Malt Liquor.

Q How did you think the drinking affected you?

A It affected me a whole lot.

Q Well, if you have a can of beer, can you feel it?

A Yes, sir.

Q If you have two cans of beer, can you feel it?

A Oh, yes, sir.

Q What happens if you have three cans of beer?

A It still bothers me.

Q Sir?

A It's just I'm not the same Willie Mack.

Q All right. What did you do with the money that you got out of the first robbery, the Safeway robbery?

A Oh, I—

Q Excuse me. Not Safeway. The Jif–E Mart.

A Gamble.

Q All right, sir. And isn't that the Jif–E Mart on 94, on Frank Street, that is kind of close to the Safeway store?

A Yes, sir.

Q All right. You never robbed the Safeway store, did you?

A No, sir.

Q All right. You said a while back that—well, I don't know that you did.

What did you use to rob the—what weapon did you have at the Jif–E Mart store?

A A pistol. I don't know what.

Q You don't know what make, do you?

A No.

Q How big was that pistol?

A Pretty good size.

Q Hold your hands up to the jury so they can get a rough length.

A Well, the barrel was about that long.

Q From the handle up to the front end—

A Yes.

Q —of it, how long was it?

A The whole thing?

Q The whole thing.

A About like that.

Q Was it one of those—did you ever see a Clint Eastwood picture show?

A Like one of them.

Q Was it that big?

A Yes, sir.

Q The kind Clint Eastwood uses or not?

A Yes, sir.

Q What color was it?

A Silver.

Q Silver.

And did you use any kind of disguise on that robbery or a cover-up?

A Yes, sir.

Q What?

A A stocking cap, whatever they call it.

Q All right, sir. Where did you get that pistol? Who did you receive it from?

A Leroy.

Q Where did Leroy get the pistol?

A I don't know the dude's name.

Q Well, let me ask you this: Where does this person live? Does he live in a house?

A He lives in some—in some apartments.

Q And these apartments, do you know the main highway where those apartments are?

A All I know is Diboll. I just say by Diboll.

Q All right. And do you remember having been to those apartments once or more times? Been there one or more times?

A One.

Q You never—and when was that?

A When me and Leroy and Mr. T. went there and got the pistol.

Q Well, did you have any friends that lived in that apartment—

A Well,—

Q —project?

A Well, my cousin had a partner. I never did see him. I don't know who he looked like or what. We went over there one day.

Q Well, I say—that is what I asked you, had you ever been over there before you went to get the pistol?

A Yes, sir, but not over to that dude's house.

Q Oh, no. You been to those apartments before, though, had you not?

A Yes, sir.

Q On the first time that you went over to those apartments, who did you go to see?

A Well, I went over there with my cousin, but we didn't go to the apartments where we got the pistol from.

Q No, sir. I am just asking you, the first time you went over to those apartments, who did you go to see?

A I don't know the dude's name.

Q Did you go to visit with your cousin after you went over there and got the pistol?

A Oh, that was before.

Q When you went to see your cousin.

A Me and my cousin went over there.

Q To where?

A To a friend of his.

Q All right. Who is the friend?

A I don't know his name. I never seen him.

Q All right, sir. Did he live in the same close area where the apartment was that—where Leroy got the pistol?

A Yes, sir.

Q Close to it?

A Yes, sir.

Q And on the first time you went over to that—all those apartments, did you go inside an apartment?

A No, sir. I never been in none of them.

Q All right. Why did you go over there the first time?

A Well, my cousin, he had a partner over there and he went over to see if he can get a beer, can of beer.

 

Q Who is your cousin?

A Lonnel.

Q All right. And did you get any beer?

A We got one can.

Q Between the two of you?

A The three of us.

Q The three of you?

A Yes, sir.

Q Got one can of beer.

Do you know who furnished the beer?

A I don't know who the dude—that dude.

Q Was he a friend of Lonnel's?

A Yes, sir.

Q All right. Now, the second time you went over there, you went over there with Mr. T.?

A No. I had been over there two or three times before then.

Q Oh, you had?

A Yes, sir.

Q Always over to the same friend—

A Yes, sir.

Q —who furnished the beer?

Well, on the night that you and Roach and Mr. T. went over there together, had you ever been there before with them?

A No, sir.

Q All right. And did you know where you were going when you left to go over there to that apartment?

A No, sir. You know, I didn't have no occasion about knowing where we were going until I got over there.

Q Who knew where they were going?

A Well, Leroy and Mr. T. know. I didn't.

Q Why do you say that?

Who was driving?

A Mr. T.

Q Did he drive you all over to the apartments?

A Yes, sir.

Q Did he ask for any directions?

A I don't know for that occasion.

Q Well, you were in the car. Do you remember?

A I don't know.

Q Okay. Who went in the house or went inside?

A Leroy.

Q Did you and Mr. T. leave the car?

A We stayed in the car.

Q Did Leroy have a pistol when he went in the apartment?

A No, sir.

Q Did Leroy have a pistol when he came out of the apartment?

A Yes,sir.

Q Did you know who the man was that they were getting the pistol from?

A No, sir.

Q Where did you get the idea that it was a white dude?

A Because Leroy said it.

Q What did Leroy say?

A He said he was going to get a pistol from a friend of his who was a white dude.

Q Was that right before he went in there to get it—

A Yes, sir.

Q —or not?

A Before.

Q He got the pistol and you went over there to the Jif–E Mart on Frank Street, close to the loop. Right?

A Yes, sir.

Q And did Mr. T. ever get out of his car?

A No, sir.

Q Did Leroy McGrew ever get out of that car?

A No, sir.

Q Did you get out of that car?

A Yes, sir.

Q Did you get out of the car with the pistol?

A Yes, sir.

Q Did you go rob that store?

A Yes, sir.

Q And that is the Jif–E Mart store?

A Yes, sir.

Q And did you get any money out of that robbery?

A Yes, sir.

Q Did you hurt anybody?

A No, sir.

Q How much money did you get?

A I really don't know right now.

Q Who divided the money?

A Me.

Q Okay. Is that what you are supposed to do as the highjacker?

A Well, you call it—

Q What do you call yourself when you do that?

A That is robbing.

Q Just a robber?

A Yes, sir.

Q Is the robber or the triggerman the one that gets to divide the money?

A I always do.

Q All right. You done it three times now. Is that correct?

A What do you mean three times?

Q Well, you done three robberies at least, haven't you?

A Since I've been out?

Q No, sir. Since you got born?

A Yes, sir.

Q Have you done anymore?

A No, sir.

Q Are you sure?

A I'm positive.

Q All right. Now, on that night at the Jif–E Mart, you divided it.

Where did you divide that money?

A At Roach's house. On the bed in his bedroom.

Q Was Linda around anywhere?

A In the front room.

Q Did Linda see the money divided up?

A No, sir.

Q Where is the television in Linda's and Leroy's house?

A In the front room.

Q And did you all walk in the front door or the back door?

A Front door.

Q This is the first time?

A Yes, sir.

Q This is the first robbery?

A Yes, sir.

Q All right. Now, did Mr. T. and Leroy get their part of the money?

A Yes, sir.

Q Do you remember how you divided it, how much each one got?

A Well, I don't—I gave Mr. T. the hundred because he told me he didn't want but

fifty. I gave him a hundred. And Leroy—I don't know how much I give Leroy. I kept the biggest portion.

And he was telling me he needed some more, you know, some money for his rent, rent money. And his wife was, you know,—you know, pregnant.

Q Okay. Threatening to have the baby?

A Yes, sir.

Q All right. And this was out of the Jif–E Mart robbery—

A Yes, sir.

Q —you're talking about?

Now, when did you first get into—get involved in the planning and commission of the robbery that ended, at least for Deborah Davenport, that night of July the 29th, 1984?

A Leroy.

Q Where?

A At his house.

Q When?

A That same—that same day. That evening.

Q What evening?

A I forgot what day it was when we did it, really.

Q Are you talking about that Saturday?

A Yes, sir.

Q Well, you all hadn't talked about robbing the place before that?

MR. GOODWIN: Your Honor, I object. It is a leading question.

MR. ASKINS: I agree, Your Honor. I will do the best I can.

Q (By Mr. Askins) If that is when it was, on a Saturday, then, let's start Saturday morning.

What time did you get up that Saturday morning, July the 28th, 1984?

A About eleven.

Q In the morning?

A Yes.

Q Had you had anything to drink the night before?

A No, sir.

Q What did you eat from the time you got up that morning until daylight the next morning?

A Well, I like a lot of sweet things. I don't care too much about food too much. I like sweet things. Candy and stuff.

Q Sweets?

A Yes, sir.

Q Did you eat any sweets that day?

A I can't recall.

Q Did you eat any food that day?

A Yes, sir. I ate breakfast that morning. My auntie told me to eat breakfast when I got up.

Q How much breakfast did you eat?

A I ate a pretty good amount.

Q What did you have?

A Eggs, sausage, toast and some butter.

Q Did you have any milk or anything else?

A Oh, milk, yes, sir.

Q All right. That was at your—

A Auntie's house.

Q Your auntie's house. Was that Clorine Cartwright?

A Yes, sir.

Q She is now deceased, isn't she?

A Yes, sir.

Q She has died since July the 29th, hasn't she?

A I don't know, but I know she's dead.

Q All right. Did you have anything else to eat that day before you got to Diboll?

A I think. Yes, I had something, but I can't remember what it was. We had stopped at that same filling station where we robbed it, the first one.

Q Yes.

A I can't remember what it was. I believe Leroy got some gas there.

Q You bought something to eat there at the Jif–E Mart on Frank Street?

A Yes.

Q Well, did you have—you don't remember what you ate. Do you remember anything else that you ate after you all stopped at the Jif–E Mart?

A No, sir.

Q All right. Then, let's go back to this: After eleven o'clock, your auntie fed you breakfast. And I take it you got dressed, put your clothes on sometime in there.

What time did you get with Leroy McGrew?

A I really don't know. It was after dinner.

Q All right. Where?

A At his house. I walked over to his house.

Q Do you remember who was there?

A Yes, sir.

Q I'm sorry. How far did you—how far was it from Miss Cartwright's over to Leroy's house?

A Ain't but about a fifteen minute walk.

Q Okay. And who was at—

A Linda.

Q —at Roach's house?

A Linda, his wife, and kids.

Q All right. Was there a conversation among you all?

A What you mean?

Q Did you talk to Leroy and Linda and the kids or did you talk to Leroy?

A Well, I played with Leroy's little girl because everytime I go there, I always play with her, with the little girl because I always like kids.

Q You never had any kids, did you?

A No, sir, not really. I supposed to have one, but I haven't say it's mine.

Q Did you play—when did you stop playing with the little girl and decide where you—what you were going to do that day?

A Well, when Leroy and I went over there, that's—the first time when I went over there, that's when he told me he got a good place to hit.

Q He got a good place to hit?

A Yes.

Q All right. And did you all go someplace else that day?

A Yes, sir. We went to Diboll. They came by the house to get me.

Q Who?

A Leroy and his family.

Q How long did you stay at Leroy's before you left, so they could come pick you up at your house?

A Oh, about an hour.

Q Did you eat anything over there?

A No, sir. If I ain't made a mistake, I think I drunk a beer.

Q Where?

A Over at Leroy's house. If I haven't made a mistake, I think I drank a beer.

Q Was Linda around while you were drinking that beer?

A Yes, sir.

Q Did she see you drinking the beer?

A Yes, sir.

Q Are you satisfied that she saw you drink the beer?

A Yes, sir.

Q Did Leroy have a beer?

A Yes, sir.

Q And did you have anything to drink over at your auntie's house?

A No. She don't allow me to drink over there. I give her respect.

Q You give her what?

A I give her respect.

Q When they picked you up, was any beer in the car?

A No, sir.

Q You all went to Diboll?

A Yes, sir.

Q Was there any beer at Diboll?

A Not at the particular time there wasn't.

Q Where did y'all go, whose house?

A Lonnel.

Q And what was the occasion?

A What do you mean?

Q What were you all going to do down at Lonnel's house?

A Oh, we—you know, they just went down there, you know, they—you know, sisters and brother-in-laws, you know, like that.

Q And Leroy—you heard Linda McGrew testify yesterday—

A Yes, sir.

Q —didn't you?

A Yes, sir.

Q That her sister is married to Roosevelt Young. Is that right?

A Yes, sir.

Q And she, of course, married Leroy McGrew.

A Yes, sir.

Q Was this a gathering together of the Young family?

A Not really.

Q How many of them were there?

A Linda, Evie and Patricia. Three girls, Young ladies.

Q Were any of the—were there any other Youngs there?

A Lonnel.

 Well, you talking about at the house or around?

Q Wherever you all went.

A Yes, sir. Like Lonnel. I may make a mistake. I think Roosevelt was. I don't know for sure. And myself.

Q All right.

A And Roach.

Q What did you do while you were down there?

A Well, I sit around with them for a while until Deshawn say he want to get some beer.

 You know, Roach said, "I will carry you to go get a case or a half case or something like that."
 So we left.

Q Who is Deshawn?

A I really don't know his name. They call him Duck. I don't know him.

Q All right. Did Deshawn or Duck come up to you all, talking about getting beer?

A Yes, sir.

Q Was he wanting to get beer or were you all wanting to get beer?

A Well,—

Q Or all of you were wanting to get beer?

A Yes, sir.

Q Which?

A All of us.

Q Where was this?

A At Lonnel's house.

Q Did you all go get any beer?

A Yes, sir.

Q Whose car did you go in?

A Roach.

Q Was Roach's car running all right?

A Yes, sir.

Q Where did you go to get the beer?

A I call it Slippery Hill or Goat Hill, whatever the name.

Q Goat Hill or Slippery Hill?

A Yes.

Q All right. Did you stop at anytime along the highway going to or from Slipper Hill?

A Well, we stopped when we was coming back.

Q What for?

A To get—I can't say that word. Hot tamales.

Q Hot tamales?

A Yes, sir.

Q All right. And how many hot tamales did you get, Willie Mack?

A Well, I didn't get none. Deshawn bought some, some for me and him.

Q Did you get to eat any?

A Yes, sir.

Q How many did you eat?

A About four.

Q And did you all have any beer while you were over at Slipper Hill?

A Yes, sir.

Q How many beers did you have while you were at Slippery Hill?

A Well, I had drunk one before we got there and drunk another.

Q Where did you get the one that you had drunk before?

A Repeat that again.

Q You said that you got a beer over at Leroy's house up in Lufkin before you went to Diboll.

A Yes, sir.

Q An hour and a half before.
 You still didn't have that beer by the time you got to Diboll, did you?

A Oh, no. No.

Q Where did you get the beer that you had, that you finished off getting to Slippery Hill?

A Before we got to Slippery Hill?

Q Yes, sir.

A Well, we didn't have none then.

Q All right. Then, you didn't have any—but one beer up to the time you went to Slippery Hill?

A Yes, sir.

Q Did you have any beer at Slippery Hill?

A Yes, sir.

Q How much beer did you drink at Slippery Hill?

A One.

Q Had you finished it by the time you got to the hot tamale wagon?

A No, sir.

Q All right, sir. And when was the next beer you had?

A Well, we be almost in Diboll, probably at the red light.

Q Is that when you opened it or finished it?

A That's when I opened the second one.

Q All right. And how many beers did you have from the time you were there at that red light, not counting that one that you opened, up until you left Diboll?

A About five cans, five or six.

Q So, if you had five or six, that meant you already had three. Is that right?

A No. All together.

Q All together you had five or six.
How were you feeling?

A Pretty bad.

Q What do you mean by pretty bad?

A Kind of—I can't describe it.

Q Well, try the very best you can to.

A I ain't really never been just like that before.

Q Have you ever had that much beer to drink before?

A No, sir, not really.

Q Have you ever had, say, about a pint of gin before?

A Oh, yes, I had some gin before.

Q Did you get to use the whole bottle yourself, Willie Mack?

A No, sir.

Q Then you shared a bottle of gin.
Was it a big bottle or a little bottle?

A Oh, no. I didn't have no gin that day.

Q All right.

A I say I have had some.

Q And when you had it, was it a big bottle or a little bottle?

A A pint.

Q And who did you drink that pint with?

A Most of the time it was me.

Q Then you have had as high as a pint of gin by yourself?

A Yes.

Q Over what period of time?

A Yes. I don't know. I don't drink that, you know, at the same time. It may take me three or four months to drink one pint.

Q Okay. But on that Saturday, going down to Diboll and in Diboll, Slippery Hill and Leroy's house, you know you had about five or six before you left Diboll?

A Yes, sir.

Q Whenever you left.
When did you leave Diboll?

A I really don't know. It's in the evening, late in the evening.

Q Who were you with?

A Wilton Young when I left.

Q Well, did you have any reason why you didn't leave with Leroy?

A Well, Leroy told me to go with Wilt. And I asked Wilt to take me home, and he said okay.

Q Well, how did he know that Wilt was coming to Lufkin?

A Well, I don't know. He really didn't know.
I asked Wilt to take me.

Q All right. Why were you wanting to come back to Lufkin and leave all that beer?

A Well, I'm really not no drinker, really. I don't drink until I get around some friends.

Q And did you—why did Wilt tell you that he was coming to Lufkin?

MR. GOODWIN: I object. That is an assumption that he told him anything.

MR. ASKINS: Well,—I withdraw the question, Your Honor.

THE COURT: You withdraw the question?

MR. ASKINS: Yes, sir.

THE COURT: Is this as good a place as any to take an afternoon recess?

MR. ASKINS: Yes, Your Honor.

THE COURT: Ladies and gentlemen, we will take our afternoon recess at this time. We will be in recess for approximately ten minutes.

You are admonished that you are not to discuss this case among yourselves or with anyone until you have retired to consider your verdict.

We will be recessed for ten minutes.

(A recess was taken at 3:00 P.M. until 3:25 P.M.)

THE COURT: Bring the jury in, please.

(The jury returned to the courtroom at this point.)

THE COURT: You may continue with your direct examination of this witness.

MR. ASKINS: Thank you, Your Honor.

WILLIE MACK MODDEN

resumed the witness stand and testified further as follows.

DIRECT EXAMINATION
CONTINUED

QUESTIONS BY MR. ASKINS:

Q Willie Mack, when we took a break, we were trying to find out what happened down in Diboll on Saturday.

To your knowledge, did Leroy or did not Leroy tell you to get with Wilt?

A No, sir.

Q All right. Do you know where Wilt was going from Diboll or why Wilt was going to Leroy's house that Saturday night?

A No, sir. I had told Wilt to take me there.

Q All right. And does Wilt always do what you tell him to do?

A The majority, he ain't got nothing to do.

Q He will, won't he?

A Yes, sir.

Q Did you know at that time that Wilt's car was going to be used in the robbery?

A No, sir, not at that time.

Q When did you find out?

Well, let me ask you this question. Did Linda McGrew—was she ever around you when you had a beer in your hand down at Diboll?

A Yes, sir. Over at Lonnel's house.

Q And who was she with when you saw her and she was there to see you—

A Yes, sir.

Q —with a beer in your hand?

A Yes, sir.

Q When?

A Over at Lonnel's house.

Q Who was she with?

A Her sister.

Q Which sister?

A Evie and Patricia because Evie drinks some kind of champale. It looks orange or red like. I forgot now what kind it is.

Q You say Evie was drinking some kind of orange or red champale?

A Champale.

Q Was Linda drinking anything?

A Yes, sir.

Q What was Linda drinking?

A Same thing. Champale. All three of them ladies were.

Q Is that red dog wine?

A I don't know what the name of it is. I know it when I see it.

Q Okay. Had you ever tried any of it?

A No, sir.

Q Have you ever really known whether it is an alcoholic beverage?

A It's alcohol.

Q Okay. Champale of some kind?

A Yes.

Q When was it decided that—was it decided that Wilt's car would be used in the robbery?

A I think, if I ain't made a mistake, when we got back to Leroy's house.

Q Why?

A Because Leroy said his car was messed up.

Q Did you hear the car when it came— Leroy's car when it came into Leroy's house?

A No, sir. We had already went there once and he wasn't there.

Q Did he say what was wrong with his car?

A He said something about the starter or something. I don't know.

Q That's what Linda said yesterday.
 Do you recall what Leroy said about it to you?

A Yes, sir. He said something about a starter or something. I don't know.

Q Did he indicate to you that his car wasn't working? Did he tell you his car wasn't working?

A Yes, sir.

Q Okay. You heard Wilt's testimony yesterday?

A Yes, sir.

Q Was Wilt's testimony about what happened in the case—

A Yes, sir.

Q —basically true as far as you know?

A Yes, sir.

Q And when did you inform me that Wilt's information was basically true?

A Repeat that again?

Q When did you tell me that Wilt could have come over and seen you in that service station?

A Just a while ago.

Q When? During the break?

A Yes, sir.

Q Had you ever told us that before right now?

A No, sir.

Q But you had never denied, in truth, that you had stabbed the girl, had you? You did it yourself, didn't you?

A Yes, sir.

Q All right. And as far as you know, was Wilt Young involved in the robbery, in going into the store with you to rob the store?

A No, sir.

Q But did he in fact go into the store with you the first time the two of you went into the store?

A Yes, sir.

Q And did Leroy McGrew ever go into that store?

A No, sir.

Q Did Leroy McGrew, to your knowledge, ever get out of the car?

A No, sir.

Q Did Leroy McGrew know in advance that that car—did Leroy McGrew know in advance of you all going over to the hospital that that store was going to be robbed?

A Oh, yes, sir. He was the one that planned it, Leroy.

Q All right. Did you have anymore discussion about the planning of it other than that morning after you had had breakfast over at Corine's house?

Did I mess that one up?

A Yes, sir.

Q Let me try again.

On that Saturday morning after you got up and Corine fixed you that good breakfast, you went over to Leroy's house.

A Yes.

Q I believe you already testified that is when he said that he had a good place to rob—

A Yes, sir.

Q —or something to that effect.

You didn't initiate that statement, did you?

A No, sir.

Q Did he mention it at anytime after you walked back over to Corine's house from Leroy's?

A No, sir. Until we got in Diboll.

Q Who was around you when he mentioned it to you in Diboll?

A Nobody.

Q What did he have to say?

A Told me, "We got to get back to Lufkin so we can take care of some business."

Q Is that the way he referred to it, "taking care of business"?

A Yes, sir.

Q Was that the first time he ever said anything about taking care of business?

A Yes, sir.

Q When you and Wilt got then to Leroy's house, Leroy, Linda and the children were not there, were they?

A No, sir.

Q And do you have any idea what time that was?

A It was dark.

Q Do you have any recall as to how long it had been dark?

A When we were on our way to Lukfin.

Q And that was in July?

A I guess.

Q From your recall, doesn't it take the sun a long time to go down in July?

A Yes, sir.

Q In other words, night comes pretty late, doesn't it?

A Yes, sir.

Q Now, when you left Leroy's house, you and Wilt, you all didn't have any beer with you, did you?

A No, sir.

Q Is it true that Wilt doesn't drink?

A I ain't never seen him.

Q Did you have anything to drink while you are around Wilt in Diboll?

A Wilt didn't see me, no, sir.

Q All right. Did Wilt see you drink a beer at anytime that night?

A No, sir, I don't believe. No, sir, I don't believe so.

Q After you got back to town; Lufkin, that is, and Leroy and his family weren't home and you all went riding around, did you stop anywhere, you and Wilt?

A Yes. We were on the Front after we couldn't find—after Leroy wasn't at home.

Q Did you have any beer while you were at the Front?

A Not the first time I went there.

Q All right. Then, you and Wilt drove back over to Leroy's house. Is that right?

A And they just made it there.

Q All right. `Did you have any beer at Leroy's house?

A No, sir.

Q Did you watch television at Leroy's house that night?

A Yes, sir. That's when I had the beer, that second time we went back there.

Q Well, so you didn't watch television when Leroy and them first got there. Is that right?

A No, sir.

Q And then did you leave Leroy's house after Leroy and them had gotten home?

A Yes, sir.

Q Where did you go?

A Me and him and—well, I stayed there for a while until Wilt go get some money from his brother to get some gas.

Q Did he get some money to get gas?

A No, sir, not right then. He got it from Leroy.

Q And did you and Wilt and Leroy leave Leroy's house together?

A Yes, sir.

Q And where did you go?

A We went to get some gas.

Q Where did you go to get the gas?

A I don't know the place, but it had been robbed once about a couple of months ago, since I've been in jail. I don't know the name of the place on the main highway.

Q Did you and Wilt or Leroy, any one of you have any beer to drink while you were out getting that gasoline?

A No, sir.

Q After you had gotten the gasoline, where did you go?

A Front.

Q Did you all—did you stay together or did you go apart?

A No. We split up.

Q Did you have anymore beer on the Front while you were down there?

A Yes, sir.

Q How much beer did you have while you were on the Front?

A About two cans, two or three cans.

Q Well, about. Do you remember how many cans of beer you had?

A About two cans.

Q Well, that is your recall. Right?

A Yes.

Q How were you feeling?

A Pretty bad.

Q Well, when you say "pretty bad", were you sick enough to get to go home?

A Oh, no.

Q Did you know what was causing you to feel bad?

A Drinking.

Q Did you know at that time what was making you feel bad?

A Yes, sir, because everytime I drink, you know, I just—I can't.

Q Are you saying that you felt ill or that you felt mean?

A Both.

Q Where did you feel sick in your body?

A My head.

Q What about your head felt ill?

A I really can't drink that much because I got a scar problem here. I got cut once and it hurt on this side and it still hurt on this side.

Q Was your head hurting?

A A little bit. It wasn't really hurting.

Q On the outside?

A Inside.

Q Inside. All right, sir.

After you had about two beers on the Front, did you watch television then?

A Yes, sir. That's when we went and watched the wrestling match.

Q And who was watching the television with you?

A Me, Wilt, Leroy and his wife.

Q Linda McGrew?

A Yes, sir.

Q In the living room in the McGrew house?

A Yes, sir.

Q All right. And could she see you having beer, drinking beer, where she was?

A Well, at Lonnel's house, she seen me drink. As a matter of fact, I was drunk at their house when we had barbecue once.

Q At Lonnel's house, did you eat any barbecue?

A They ain't had none.

Q Did you have any?

A They didn't have no barbecue.

Q All right. So, you go back to Leroy's house and watch the wrestling match.

What did you and Wilt and Leroy do after you finished watching the wrestling match?

A Went back on the front.

Q And what did you do at the Front that time?

A Wait a minute. Let's back up a little bit.

Q All right.

A We went to the store the first time.

Q Which store?

A The one where the young lady got killed.

Q All right. And did you go in that store?

A Yes, sir.

Q Who went in that store with you?

A Me and Wilt.

Q Why did you go in the store?

A Well, I was intending to rob it.

Wilt didn't know nothing. And I see one of the—I wanted to be cool. I bought me a cup of coffee up front or something like that.

Q When you and Wilt went inside the store, as far as you know, Wilt didn't know anything about the robbery?

A No, sir.

Q And what did Wilt buy? What did Wilt buy?

A A piece of candy or something. I don't know.

Q And did you leave—did you drive off from there?

A Well, let's see. Well, I walked down the street, if I ain't made a mistake—if I ain't made a mistake, and come around the other way. Yes, I come around the other way, around the back way.

Q Who drove you over there?

A Roach.

Q Was this the trip that the robbery happened then and the murder happened then?

A No. That's the first time.

Q All right, sir. So, you drove over there—Roach drove over there the first time. Is that right?

A Yes, sir.

Q And where were you, in the front seat or back seat?

A Back seat.

Q And when you got over there, you and Wilt went in the store?

A Yes, sir.

Q Where was the car parked?

A Across to the hospital.

Q All right. What were you going to rob her with?

A Knife.

Q Where did you get the knife?

A I took it from somebody.

Q Who?

A Do I say?

Q Yes.

A Houston.

Q That is George Houston?

A Yes, sir.

Q And—

A I took it from him. He didn't know what I was going to do with it. I took it from him.

Q All right. Did you take it from him that same day or night?

A No, sir.

Q Did you take it from him that same weekend?

A I think two weeks before, I did that.

Q You're not trying to say that George Houston gave you the knife—

A No. I took it.

Q —to rob that lady or kill her, are you?

A No. I took it from him.

Q All right. And you don't mean by that that you stole it from him.

A Yes, sir.

Q Is that correct?

A Yes. You can say it like that.

Q Well, I don't—did you steal it from him or did you take it away from him?

A I took it from him.

Q How did you—why did you take it from him?

A Well, him and a dude have a misunderstanding and I took it away from him that night.

Q Well, had he pulled the knife on the other person?

A No, not really.

Q Was it open when you took it?

A No.

Q Why did you take it away from George Houston?

A Because he had it in his hand.

Q Why did you take it away from George Houston?

A Oh, well, I don't know.

Q Did you have any kind of feeling toward protecting George Houston?

MR. GOODWIN: Your Honor, I object. That is leading and suggestive.

MR. ASKINS: I agree, Your Honor, and I withdraw the question.

May I approach the witness, Your Honor?

THE COURT: You may.

Q (By Mr. Askins) I will show you State's Exhibit Number Forty-five. Would you open that knife and look at it and see if it is yours or if that is the knife that you took from George?

A Yes, sir, it is the knife I took from George.

Q Close it and put it back up there.

Did you make arrangements for that knife to be surrendered to Texas Ranger Don Morris?

A Yes, sir.

Q And was that about three weeks ago? Had it been in the past month?

A No, sir. It's been—I think that was last week, the week before last. I don't know.

Q Okay. Was it last week?

A Yes, sir.

Q All right, sir. But you told—is that the knife you had the night Deborah Davenport was killed?

A Yes, sir.

Q Is that the knife that you used to stab Deborah Davenport with?

A Yes, sir.

Q Then, will you please tell all of us why it was that you stabbed Deborah Davenport?

A Why I did it?

Q Yes.

A Don't leave no witness.

Q And you learned that in prison?

A Yes, sir.

Q And had you told, if you recall, Officer Leon Price that the next robbery you did, you were going to kill a witness?

A If I did, I don't remember. I may have. I don't know.

Q Do you remember talking to Leon Price on more than one occasion?

Excuse me. Do you recall talking to Leon Price at the Family Affair?

A Yes, sir.

Q Did you talk to him at any other place in Diboll, Texas?

A No, sir. Wasn't nowhere but Family Affair at that moment in time.

Q Was that the only time you ever had talked to him up to the time you were picked up for investigation—

A Yes, sir.

Q —of the Jif–E Mart, the first robbery?

A No. I had seen him in the club. I may pass by and speak to him, you know.

Q Where?

A At the club.

Q At the Family Affair?

A Yes, sir.

Q So, you had seen him more than once at the Family Affair. Is that right?

A Oh, yes, sir. I never did, you know, make no conversation with him but once.

Q Do you remember ever seeing Mr. Price's pistol down there?

A No, sir. If I did, I don't remember.

Q But the actuallity is that your reason for killing Deborah Davenport was what? Why did you kill her?

A No witness.

Q All right. Will you tell us what happened when you walked in that station that night?

Was George Houston in there at the time you walked in the last time to rob that store, the second time?

A George Houston?

Q Excuse me. I'm sorry. Not George Houston. Wilt Young?

A No, sir.

Q Were you by yourself?

A Yes, sir.

Q And will you tell us what happened as you walked in the door, up to the time that you left that store?

A Well, I told her this was a stick-up and give me all the money. I hit her and she fell. I started stabbing her.

Q Did you have the knife out at the time you told her it was a stick-up?

A Yes, sir.

Q Did she give you the money out of the cash register?

A Yes, sir.

Q Did she give you the money out of the floor drop?

A Yes, sir.

Q Did you ever try to get her to open the safe in the back room?

A No, sir.

Q Did you ever hold her from behind as you were stabbing her?

A No, sir.

Q When you hit her, which fist did you hit her with?

A I think with my left, if I ain't make a mistake. I think. I don't know for sure, but maybe my right. I don't know for sure.

Q Well, which knife did you have the hand—which hand did you have the knife in?

A Well, when I had her down, I had it in my right hand.

Q When you were stabbing her?

A Yes, sir.

Q Do you remember which hand you had the knife in when you came up to her and told her, "This is a stick-up"?

A I think I had it in my left hand. I don't know.

Q And after she had given you the money from the cash register and given you the money from the floor drop—

A No.

Q Pardon me?

A She had—when she give me the money out of the cash register, I told her that I know there is more money somewhere else because, you know, like I say, I been a robber. I know they don't keep just money in the cash register, you know.

Q And did she give you the money in the cash register—from the cash register?

A Yes, sir.

Q How did she give it to you?

A In a paper bag.

Q And did she give you the money from the floor drop?

A Yes, sir.

Q And had you hit her before she gave you the money from the floor drop?

A No, sir.

Q And how did she give you the money from the floor drop?

A I told her I didn't have all the money and I know she is lying.

Q All right. And did she give it to you?

A Yes, sir.

Q And that was out of the floor drop?

A Yes, sir.

Q Did she put it in a sack or did she give you the money?

A Well, they were in a money bag and a jar.

Q And did you get the jar and the money bag?

A I got all of that.

Q And did you take the paper sack in your hand also?

A Yes, sir.

Q Did you have the money bag, the jar or the paper sack in your hand when you hit her?

A No, sir.

Q Where was—where were those three things?

A Sitting down on the floor.

Q Why would you put them down on the floor?

A Because I didn't want to leave no witness.

Q And what was the first thing you did to this lady in order to have no witnesses?

A I hit her.

Q With your fist?

A Yes, sir.

Q And what happened to her when you hit her?

A She fell.

Q Did she fall—where did she fall?

A In the back room.

Q Was she already in the back room?

A No, sir.

Q When she fell, did she make any movements after she had gotten to the ground?

A Yes, sir.

Q What movements did she make?

A Kind of scuffled with me. Tried to fight back.

Q Was she successful?

A What you mean?

Q Was she able to get you away from her for any period of time?

A No, sir.

Q How did you hold her?

A With one knee on her and one knee on the floor.

Q And which hand did you have the knife in as you stabbed her?

A My right hand.

Q Willie Mack, do you remember which was the first wound to her?

A No, sir.

Q Do you remember where you stabbed her first?

A All I remember is her head.

Q Did you—do you remember why you were stabbing her in the head?

A Do I remember?

Q No. Do you remember why you stabbed her in the head?

A So I couldn't have no witness.

Q Well, you certainly didn't count the number of times you stabbed her, did you?

A No, sir.

Q Willie Mack, why would you stab her in the head if you were trying to kill her?

A I didn't want no witness.

Q All right. So, to your knowledge, did Wilt Young come into the store?

A Yes, sir.

Q And did he holler at you and tell you to get out of there?

A Yes, sir.

Q What did he say?

A Told me, "Man, come on out of there." He was scared.

Q Did you leave?

A Yes, sir.

Q Did you have to go back inside, as he testified?

A Yes, sir.

Q Did you get the jar and the money bag—

A Yes, sir.

Q —and the paper sack?

A Yes, sir.

Q Did you ever go back in and stab that lady anymore?

A No, sir.

Q Did you leave the station then?

A Yes, sir.

Q And did you run with Wilt back to the car?

A Yes, sir.

We weren't side by side, though.

Q Who was ahead, him or you?

A Wilt.

Q How far apart were you whenever you were the farthest apart?

A I honestly can't remember, really.

Q All right. Do you remember discussing the murder—

A Yes, sir.

Q —with Wilt and Leroy on the way home in the car?

A No, sir.

Q Do you remember if anything was said?

A I think Leroy asked me if she was dead. Wilt did too or something.

Wilt said, "She dead?"

I said, "I don't know."

I don't know who said it, really.

Q They asked you, "Is she dead"?

A Yes.

Q And he told you—had he ever told you to kill her?

A No, sir.

Q Then, did Wilt tell him or did you tell him that you had stabbed the lady?

A I think—yes, I did.

Q All right. What happened on the way home or over at Leroy's house?

A Over to Leroy's house?

Q Yes.

A Well, Wilt was scared. He didn't know what to do.

And Leroy went in the front door; told us to go to the back door, to the side door.

Q Willie Mack, I know that I was asking you what happened on the way from Boles parking lot over to Leroy's house.

Did you all talk about what happened at all?

A Yes, sir. I talked to Leroy and Wilt.

Q What did you tell them?

A I said, "I think I killed a woman."

Q What did they have to say?

A Leroy really didn't say nothing.

Q What did Wilt say?

A Just looked at me and shook his head.

Q Okay. I want to go back to the scene of the murder and I want to ask you what was going on in your head when the murder was going on?

A I was drinking. I never—I never hurt nobody like that. I've been doing some robbing. I never hurt nobody. I just was drunk.

Q Are you telling this jury that you knew what you were doing as you were going in the door to rob the store?

A Yes, sir, but I didn't want to hurt nobody.

I had told Leroy, "Get a pistol," and he couldn't find one.

He just said, "Fuck it." I mean, excuse me.

Q That's all right.

A Well, that's the way he said it.

"Use the knife."

Q He said to use the knife?

A Yes, sir.

Q When did he tell you to use the knife?

A After we couldn't find no pistol.

Q So, it was Leroy who told you to use the knife—

A Yes, sir.

Q —to rob the place?

A Yes, sir.
I will tell him to his face, too.

Q Did he tell you to use the knife to kill the woman if it was necessary?

A No, sir.

Q Had you all discussed what to do in the event you didn't want a witness left?

A Say that again.

Q Did you and Leroy, before that happened that night, talk about what to do about any witness that was left?

A No, sir.

Q Had either Leroy or Mr. T. told you after—

MR. GOODWIN: Your Honor, I am going to object to this leading question.

MR. ASKINS: All right. I appreciate that. I will withdraw the question, Your Honor.

Q (By Mr. Askins) Now, Willie Mack—

A Yes, sir.

Q —can you look up, if you can.
The day after or that night after you got over to Leroy's house, did you all divide the money up?

A Yes, sir.

Q Did Wilt get money?

A Yes,sir.

Q Did Leroy get money?

A Yes, sir.

Q Did you get all the money you felt like you had coming to you?

A No.

Q Why not?

A I give Leroy enough to pay his rent.

Q Was that before you made the split?

A No, sir. When we were putting the money down there in the house.

Q Was Officer Price's testimony about his talking with you correct?

A What do you mean?

Q You heard Officer Price testifying about seeing you on the Front after the murder?

A Yes, sir.

Q Is what he said correct, as far as you and Leroy being there and him coming on the scene and stopping and calling you all over?

A Yes, sir.

Q Do you remember arguing with Mr. Price at that time?

A Yes, sir.

Q How were you feeling?

A Pretty bad. I had been drinking.
After I saw him, Leroy told me to give him the six-pack of beer and the money that I had and stuff.

Q Did you get that money back?

A What I give him?

Q Yes.

A No, sir.

Q You didn't never?

A No, sir.
I always did, you know, help him.

Q When Officer Price was walking up to get you, and you gave Leroy the money and the beer—

A Yes, sir. Well, I give him the money.

When Officer Price put a light on me, Leroy told me give me everything I got. I gave it to him. I reached around with my hand like that and give it to him.

Q Did you ever get that money back—

A Yes, sir.

Q —from Leroy?

A Yes, sir.

Q That is what I was asking.

A Yes, sir.

Q All right. You were taken down to the jail. Is that correct?

A Yes, sir.

Q And you were questioned by Officer Price and Officer Hayes. Is that correct?

A Yes, sir.

Q The two men who testified here.

A Yes, sir.

Q And you denied being involved in it, didn't you?

A Yes, sir.

Q Why?

A Because I didn't want to go to jail.

Q So, you were lying then. Is that correct?

A Yes, sir.

Q While you were in jail—well, let's go ahead with this.

You did take off and go down to Kirbyville. Is that correct?

A Yes, sir.

Q And you were arrested down there two months or so later. Right?

A Yes, sir.

Q Did Leroy ever contact you after you left his house that Sunday, after the money—

A After we did the robbery?

Q Yes.

A I stayed all night with him.

Q Yes. And where did you sleep—

A On the couch.

Q —at Leroy's house?

A On the couch.

Q Where was the couch? In the living room where the television is?

A Yes, sir.

Q Did Linda see you there?

A Yes, sir.

Q Now, did she cook a meal for you?

A No. She cooked for the kids. I didn't eat.

Q When did you leave that house that morning after you had slept on the couch?

A I left that night.

Q You stayed that whole night there?

A Yes, sir. And left that night.
 We barbecued.

Q At Leroy's house?

A Yes, sir.

Q Where did you get the meat to barbecue?

A The meat?

Q Yes, sir.

A I forgot that store.

Q Did you use the money from the robbery—

A Yes, sir.

Q —to buy that meat with?

A Yes, sir.

Q Did Linda eat any of this meat?

A Sir?

Q Did Linda eat any of that meat?

A Yes, sir.

Q Of course, you and Leroy did?

A Me and Leroy, Roach—I mean me and Leroy, Roosevelt, Linda. There was a whole lot of us there.

Q Did anybody know about the robbery, except you and Roach that was there eating?

A Linda.

Q Linda knew about the robbery?

A You know, when Roach told her.

Q Yes. Okay.

Nobody else eating that barbecue over there on that Sunday knew about it, though, did they?

A No, sir.

Q And certainly Roosevelt Young did not know about it. Is that right?

A No, sir.

Q All right. You were arrested down in Kirbyville by that lady officer that invited you out from under the bed, weren't you?

A Yes, sir.

Q And you called that lady Grandma, whose house you were in. Right?

A Yes, sir.

Q Is she any kin to you?

A On my step-daddy's side. That is my step-daddy's momma.

Q Fine. After you got over here in the Angelina County Jail—and that is where you were put from Kirbyville, isn't it?

A Yes.

Q You got in some trouble over there, didn't you?

A Yes, sir.

Q All right. Did you get into any—did you ever try to escape from that jail?

A Yes, sir.

Q All right. How did you try to escape?

A Through the wall.

Q Well, were you going to dig a hole through it or what?

A Yes, sir, dig a hole.

Q Did you get a hole dug in the wall?

A Yes, sir.

Q Did you make it out?

A No, sir.

Q Did you have another occasion to try to escape by breaking out like that?

A No, sir.

Q Were you accused of that?

A Yes, sir.

Q Did you have anything to do with that second attempt to escape?

A No, sir. But I break the thing off for the dude that he told me to get for him.

Q I'm sorry. I didn't understand you.

A That long thing he told me to break for him.

Q Another prisoner?

A Yes, sir. Named Philly Gibson.

Q Is this long thing some kind of tool to dig out with?

A Yes.

Q Did you help him dig?

A No, sir.

Q All right. Did you also make a knife over there while you were in jail?

A Yes, sir.

Q What did you make that knife out of ?

A One of them vents.

Q Air vent?

A Yes, sir.

Q What did you make that knife for?

A Kill myself.

Q Why did you want to kill yourself?

A I feel like I had no chance.

Q All right. Can you think of anything else that you did over there before this past week?

A Yes, sir.

Q What?

A Tried to hang myself.

Q But that was this week.

Can you think of anything before that?

A No, sir.

Q All right. So, when did you try to hang yourself?

A Monday night.

Q Why did you try to hand yourself?

A Because I ain't had no chance. I don't want to die. But I feel like I had no chance.

MR. ASKINS: Pass the witness.

May I approach the bench, Your Honor.

(Discussion at the bench.)

### WILLIE MACK MODDEN

resumed the witness stand and testified further as follows.

### CROSS EXAMINATION
QUESTIONS BY MR. GOODWIN:

Q You are Willie Mack Modden, aren't you?

A Yes.

Q Willie Mack, you know me, do you not?

A Yes.

Q I am going to ask you some questions. You are going to tell the jury the truth, aren't you?

A Yes.

Q Willie Mack, looking back on your childhood, where you were raised, Rosalie Modden, you say that was your second mother or your aunt really?

A That's my aunt.

Q And you were raised by her with a number of kids, weren't you?

A Yes, sir.

Q And, of course, you were given a good upbringing and raising, weren't you?

A Yes, sir.

Q And when we talk about whippings with a light cord or an extension cord, whippings with some other things, she treated all you kids the same, did she not?

A Yes, sir.

Q You are not telling the jury that you never did get a whipping that you didn't deserve, are you?

A No, sir.

Q You always deserved what you got?

A Yes, sir.

Q But as far as her trying to teach you right from wrong, she did talk to you and counsel with you, didn't she?

A Yes, sir.

Q So, it is not like you don't know what is wrong and what is right. You do know those things, don't you, Willie Mack?

A Yes, sir.

Q And when you did those things as a kid, you knew they were wrong.

A Yes, sir.

Q When you got older and you said you started stealing things and skipping school, you also knew those were wrong, didn't you?

A Yes, sir.

Q When you skipped school and did those things, you did those things because you wanted to, didn't you?

A Yes, sir.

Q And you would do those things whether you were—well, you really didn't drink back then, did you?

A No, sir.

Q Drinking is something that came later, isn't it?

A Yes, sir.

Q But when you did those things, you knew that is not what your auntie taught you.

A That's right.

Q And you knew that those things were wrong?

A Yes, sir.

Q And you did those things deliberately because you wanted to, didn't you?

A Yes, sir.

Q And further, you remember when you first went to the pen on the burglary?

A Yes, sir.

Q You said there were others with you.

A Yes, sir.

Q And although there were others with you, by that time, Willie Mack, you had been stealing other things, hadn't you?

A Yes, sir.

Q And like you said later about the air conditioner, burglaries were no big deal, were they?

A No, sir.

Q And you're not really telling the jury that the only reason you did them is because someone else got you to do them, are you?

A No, sir.

Q Because you, yourself, Willie Mack Modden, did them because you wanted to do them at the time, didn't you?

A Yes, sir.

Q And they were wrong and you knew they were wrong, didn't you?

A Yes, sir.

Q But you still did them?

A Yes, sir.

Q And then, you know, back to the burglaries—let's talk about the burglaries. I believe the first one that you went to the pen for—was that the Dairy Queen burglary?

A No, sir. It was Phil's Taxi Company.

Q Okay. Do you remember the Dairy Queen burglary I'm talking about? Was it Dairy Queen?

A No. It was a store, too. It wasn't no Dairy Queen.

Q You know, where you were in front and you and your friends—

A Oh, yes. I know where you're talking about.

Q You couldn't get in and not only you couldn't get in the front, but there was police officers in front.

A Yes, sir.

Q And you knew that if you stayed there and broke in, what would happen?

A Go to jail.

Q The police officers would catch you because they would see you, wouldn't they?

A Yes, sir.

Q And you thought of a better idea, didn't you?

A Yes, sir.

Q Willie Mack, it was your idea to go around to the back?

A Yes, sir.

Q And you're the one—you're not blaming anyone else. You're taking that blame. You are the one that figured out how to break in the back door.

A Yes, sir.

Q Is that correct?

A Yes, sir.

Q So, the fact that you were involved with someone else in that particular robbery, you're not blaming them, are you?

A No, sir.

Q Because you knew by that time what was right and wrong, and you did it because you wanted to.

A Yes, sir.

Q And then let's go up to the first robbery, you know, the one that caused you to get twenty-five years in TDC. And that is what you were given, wasn't it, twenty-five years?

A Yes, sir.

Q You actually spent only nine and a half years, didn't you?

A Yes, sir.

Q If you hadn't lost all that good time, you could have got out a lot earlier, couldn't you?

A Yes, sir.

Q But on that robbery, no one else helped you plan that robbery, did they?

A No, sir.

Q And you had a gun, and you had walked around with that gun quite some time. Isn't that right?

A Yes, sir.

Q And you said you kept that gun until you needed it. Is that what you said earlier?

A Yes, sir.

Q And when you decided to rob the grocery store, you needed that gun, didn't you?

A Yes, sir.

Q And did you go in the store and pull the gun on the woman or wait until she came outside?

A Wait until she came outside to empty some trash.

Q Empty trash?

A Yes, sir.

Q Was it pretty close to the time when she would be closing up?

A Yes, sir.

Q When she came outside to empty the trash, did you make her go back inside the store and get the money?

A Yes, sir.

Q And did she go back in the store and get the money?

A Yes, sir.

Q And she handed you the money or put it in a sack?

A Put it in a sack, a paper sack.

Q Okay. And then after you got the money, did you then make her go back outside? .

A Yes, sir.

Q And after you got back outside, you still had the gun, didn't you?

A Yes, sir.

Q That is when you made her undress, wasn't it?

A Yes, sir.

Q Why did you make her undress?

A So I could get away.

Q Had you planned that?

A Not really.

Q How did you know to do that?

A Well, it just popped in my mind.

Q Okay. When it came into your mind, it seemed like a good idea?

A Yes, sir.

Q And when you did it, you did it because you wanted to?

A Yes, sir.

Q And you had a purpose for doing it because it would take a woman a while to get dressed and then go back and make a phone call, wouldn't it?

A Yes, sir.

Q And while she is dressing and making the phone call, you are running away, aren't you, Willie Mack?

A Yes, sir.

Q You got away with that robbery, didn't you?

A Yes, sir.

Q For a while. You got away with it for a month or two.

A Yes, sir. About two months.

Q I believe that robbery was probably committed in June and you weren't arrested until up in August.

A Yes, sir.

Q Does that sound about right?

A Yes, sir.

Q But after that robbery, I believe you and your brother—his last name is Williams. Don't you have a brother whose last name is Williams?

A Yes, sir.

Q Y'all burglarized that store, didn't you?

Did you all break into that store one time?

A No.

Q But after that robbery, he robbed that store, didn't he?

A Yes, sir.

Q And he got caught.

A Yes, sir.

Q When he got caught, did he tell on you?

A Yes, sir.

Q And then that's when you got apprehended.

So, if the woman at the store, if she said— you know, you didn't rape the woman, did you?

A No, sir. I don't believe in nothing like that.

Q But if she said you said, "I'm not going to rape you, but I should," she would be lying?

A Yes, sir.

Q You didn't rape her, but did you tell her, "I'm not going to rape you, but I should"?

A I ain't said nothing like that.

Q But at any rate, you did make her undress outside the store?

A Yes, sir.

Q While you were standing there, you had a gun on her.

A Yes, sir.

Q Okay. And from there you went to TDC, and you got in several incidents at TDC.

A Yes, sir.

Q You would cuss the guards and you would cuss the prisoners and you all would get in fights and things like that?

A Yes, sir.

Q And they would try to make you do things that you didn't want to do and cause you problems.

A Yes, sir.

Q You spent a lot of time in solitary, didn't you?

A Yes, sir.

Q When you say "solitary", does that mean they take you out of the general prison population and put you in a cell by yourself?

A Yes, sir. Kind of dark.

Q And they did that when you wouldn't wash dishes. Remember when you wanted the ice water?

A Yes, sir.

Q You felt you had a right to get ice water back there.

A Yes, sir.

Q And, of course, there were other inmates that did this, but they came and got you, didn't they?

A Yes, sir.

Q Of course, on your disciplinary report, does it reflect that actually you were the leader of that strike? In other words, that was your idea. And there is nothing wrong with being a leader.

A I wasn't, though.

Q You wasn't the leader?

A No, sir.

Q But at any rate, you got blamed for it and you got solitary.

A Yes, sir.

Q And then when you—when you got in fights—of course, in TDC, you weren't drunk when you got into fights, were you?

A No, sir.

Q And you weren't acting under the influence of any alcohol at all.

A No, sir.

Q Even when the time the person—remember when the guy called your mother a bad name, a fight broke out and you got hit. Remember that?

You still have the scar there, don't you?

A Yes, sir.

Q And you thought about that, didn't you?

A Yes, sir.

Q You went back to your cell and you still thought about it and you got your toothbrush. And how did you do that?

A I melted the toothbrush and put the razors together with it on the toothbrush.

Q And a toothbrush, that is plastic kind of like that pencil there.

A Yes, sir.

Q And when you melt it, it gets hot and you can stick those things down in it, can't you?

A Yes, sir.

Q And did you stick one or two razor blades in it?

A Four all together.

Q Four all together.

Were those single edge or double edge razor blades?

A Those were those thin ones.

Q I beg your pardon?

A The little thin ones.

Q Those little thin ones?

A Yes, sir.

Q Kind of like those that we get off of those safety razors?

A Yes, sir.

Q But small, thin ones.

But when you put them all four together, they make a long cutting edge like that?

A What do you mean?

Q Well, were they from one end of the toothbrush all the way down to the other end?

A No, sir.

Q Did you—

A Both sides.

Q You put them on both sides?

A Yes.

Q All four sides?

A No.

Q Two sides?

A Yes, sir.

Q So, two were placed on one side and two were placed on the other side?

A Yes, sir.

Q Okay. And that was that night after that happened, isn't it?

A Yes. On a Saturday, late Saturday evening. And it happened that Sunday morning when I did it.

Q And you knew that he had done you wrong, didn't you?

A Yes, sir.

Q You thought about it and you thought about what he did, didn't you?

A Yes, sir.

Q The more you thought about it, it didn't change your mind, did it, Willie Mack?

A No, sir.

Q And after having thought about it, then you went to—where did you go the next day, the shower?

A Yes, sir.

Q While you were in the shower and he had soap on his face, you cut his throat?

A No. I cut across up here.

Q You cut across there?

A Yes, sir.

Q Okay. Didn't kill him. It didn't kill him, did it, Willie Mack?

A No, sir.

Q But anyway, you did cut him?

A Yes, sir.

Q You weren't drunk then, were you?

A No, sir.

Q And no one told you what to do then, did they?

A No, sir.

Q And you did that because you wanted to do it.

A Yes, sir.

Q Maybe under the same circumstances you would do it again?

A I don't know.

Q But at any rate, of all the problems that you did have in TDC, you weren't intoxicated then, were you?

A No, sir.

Q You weren't intoxicated?

A No, sir.

Q What would the guards do when you talked to them like you did?

A Beat us.

Q And you still did it, didn't you?

A Yes, sir.

Q And looking back—let's see. There was a burglary—there was a burglary at Diboll. Remember that one, where Wilt was in?

A Yes, sir.

Q Wilt and someone else?

A Yes, sir.

Q You say you're the only one that got caught?

A I didn't get caught. Somebody told I did it, but I didn't.

Q Someone told you did it?

A Yes, sir.

Q Of course, they were with you, but you did do it, didn't you?

A No, sir.

Q You didn't do it?

A I was at my mother-in-law's house at that time.

Q You were at your mother-in-law's house?

A Yes, sir.

Q How old were you?

A About twent-three.

Q And you said you had already—had you already been in the pen at that time?

A Yes, sir.

Q But then you come on to Lufkin.

Of course, Willie Mack, when you were paroled out in December of '83, where did you parole to, Lufkin?

A No. Diboll.

Q Diboll. Your parole plan said Diboll, didn't it?

A Yes, sir.

Q Shortly after you moved back, you ended up moving in with an aunt of yours that lived in Lufkin.

A Yes, sir.

Q How old was she?

A I can't—I can't recall.

Q You don't know how old she was?

A No. She's pretty old.

Q What was her name?

A Corine Cartwright.

Q How long did you live there?

A It was a pretty—a couple of months.

Q Okay. And since this incident happened, I think Corine died, didn't she?

A Yes, sir.

Q So, you moved in with her and then at sometime along the way, you started working at Mims Meat Company.

A No. I was working at Mims before I left—I mean when I was in Diboll.

Q When you were in Diboll, you worked for Mims?

A Yes.

Q Could you perform your duties there and know what you were supposed to do?

A Well, I was getting cow hides and putting salt on them.

Q Okay. When they killed those cows, they skin them out and salt them down?

A Yes, sir.

Q And then put them someplace else. Put them in a barrel or a big vat?

A No. They put them in a big old room, five to a layer, five this way and five this way and five that way, and five that way. A four-way corner.

Q Okay. You didn't have any problems with that job, did you?

A No, sir.

Q And you worked at a sawmill?

A Yes, sir.

Q And at that sawmill, what did you do?

A Worked on the glue machine.

Q Were you able to handle that job?

A Yes, sir.

Q What did you have to do?

A I really—I forgot what it was, but we were throwing some plywood on top of that machine and we were standing there putting that glue on it and putting two by four layers on there and they stuck together.

Q That is where you put the plywood together?

A Yes, sir.

Q You have got to be fast to do that, don't you?

A Yes, sir.

Q Is that when you come through the plant and they are making that plywood and throwing these sheets over there?

A Oh, no, sir.

Q That's not it?

You know what I am talking about?

A Yes, sir. I wasn't on—I was working on the gluing machine, when they bring it over there.

Q You have got to be real fast to work at that?

A Oh, yes, sir.

Q You got to know what you're doing?

A That's right.

Q You have got to be able to know your job and the details of it and act when you're supposed to?

A That's right.

Q Because if you don't do it right, you can mess it all up.

A That's right.

Q You didn't have any problems with that job, though, did you?

A No. They put me on the clean-up crew. That's when I had a little problem.

Q Had a little what?

A Problem.

Q All right. Let's take you on into Lufkin here.

You were living in Lufkin and you met Leroy.

Of course, had you started drinking now a lot?

You never did drink a lot, did you?

A No, sir.

Q As far as drinking a lot the day this happened, you didn't drink a lot, did you?

A I drank—repeat your words.

Q From the time—in other words, you never were, even at the time this happened, you never were known to be an alcoholic or someone that drank everyday a whole lot?

A No, sir.

Q On this date in question—let's back up to the first robbery. You know, the first robbery at the Jif–E Mart?

A Yes, sir.

Q Of course, robbery wasn't new to you, was it?

A No, sir.

Q You had done this before?

A Yes, sir.

Q You had done it by yourself and you knew how they were done, didn't you?

A Yes, sir.

Q And you say you even learned more about it when you went to TDC.

A Yes, sir.

Q And at TDC, you learned from some people there—what did you call them, the ones that told you not to leave witnesses?

A I call them—we always called them the gangsters.

Q Gangsters. Okay. Of course, they thought it was a good idea not to leave witnesses?

A Yes, sir.

Q Of course, you left a witness down in Silsbee.

A Yes, sir.

Q And because you left a witness—truthfully speaking, because you left that witness, you went to TDC for nine and a half years.

A Well, she didn't identify me, though.

Q She didn't identify you?

A No, sir.

Q But then later on at the Jif–E Mart robbery, you didn't kill that woman, did you? You didn't kill the woman at the Jif–E Mart, did you, or was it a male?

A It was a woman.

Q Okay. But you didn't kill her?

A No, sir.

Q You had a gun?

A Yes, sir.

Q You had a stocking over your head?

A Yes, sir.

Q After that robbery, you were talked to. After that robbery, you were questioned by Leon or one of the other law enforcement officers. They questioned you whether or not you committed that robbery.

A Yes, sir.

Q Of course, we know you committed it now because you said you did, didn't you?

A Yes, sir.

Q But you wore a stocking over your head.

A Yes, sir.

Q Did they also tell you, do you realize, the person you robbed there picked your picture out even though you had a stocking on?

A Yes, sir.

Q So, even though you had a stocking on, that woman identified you, didn't she?

A Yes, sir. That's what they say.

Q Okay. They said that. And you were questioned about it?

A Yes, sir.

Q Because she had identified you, you were questioned about it.

A Yes, sir.

Q You were brought in and they told you, "Willie Mack—", or asked you, "Did you commit the robbery out at Jif–E Mart?"

And you said, "No, I didn't do that."

A Yes, sir, I sure did.

Q And not that it matters a lot now, Willie Mack, because you told the truth, but you lied to them, didn't you?

A Yes, sir.

Q And they said, "Well, Willie Mack, that woman was able to pick you out."

And you said, "Didn't do it."

Of course, you couldn't have said, "I had a stocking over my face and she couldn't," because that would be admitting to it.

But at any rate, you were questioned thoroughly by the police and you were picked out by that woman even though you had a stocking on your head. Isn't that true, Willie Mack?

A Yes, sir.

Q So that being the case, that makes it all more realistic, the fact, you know, now you believe what they believe over at TDC, don't you?

What I am saying is, then you believed it after that because you left a witness. You had a stocking over your face and didn't think she could identify you.

A Yes, sir.

Q You didn't kill her, but now—well, it would be logical that if you had killed that person, she couldn't pick you out with a stocking over your face, could she?

A Yes, sir.

Q She couldn't have done it, could she?

A. Yes, sir.

Q She could have?

A Oh, no, sir.

Q Okay. If I ask you a question that you don't understand, go ahead and ask me to repeat it or slow down because I want to give you the chance to answer anything or to explain anything. Okay?

And further, Willie Mack, that being the case, and they questioned you, you got together at some point in time with—of course, that robbery, I know that Leroy—you say he was involved. Was Leroy really involved in that?

A Yes, sir.

That Jif–E Mart?

Q That Jif–E Mart.

A That first?

Q Yes.

A Yes, sir.

Q He was?

A Yes, sir.

Q Of course, although he was involved, Willie Mack, it is not like he got you to do something that you had never done before, is it?

A No, sir.

Q Because you had done it.

A Yes, sir.

Q Leroy never has done that, has he?

A No, sir. Not that I knows of, no, sir.

Q What I am saying is, generally speaking, Leroy is known as an old thief. Have you ever heard that term?

A Yes, sir.

Q He takes stuff.

A Yes, sir.

Q He steals stuff, but he don't have the guts enough to go out there and pull a robbery, does he?

A No, sir.

Q But he's a thief. He's been to the pen for stealing. Is that right?

A Yes, sir, I guess.

Q You know he's been to the pen?

A Yes, sir.

Q So, he had never done that, but you have done that before, and the fact that you have done it before and Leroy hasn't done it before or whatever the circumstances, you're not telling the jury, in all honesty, that he made you do that, are you?

A No, sir.

Q He didn't make you do it, did he?

A No, sir.

Q And, of course, you talk about it, thing about it. And, of course, if you don't want to do that robbery, you don't have to, do you?

A That's right.

Q You remember when you were in the Fina Station and you looked around and saw that dude walking back and forth?

A Yes, sir.

Q The place wasn't very cool then, was it?

A No, sir.

Q Why did you think it wasn't very cool?

A Because I saw that dude walking back and forth. Plus that, somebody else was out there, too.

Q And if you went ahead and robbed it then, what would happen?

A It wouldn't be like it was.

I feel like this: It wouldn't be like it was that it happened last time.

Q Right. But you would have gotten caught because that dude was walking by. Is that right?

A Yes, sir.

 

Q In other words, there were witnesses around, and you thought about that, didn't you?

A Yes, sir.

Q And that is why you went back to the car and told Leroy or whoever, "That isn't cool."

A Yes, sir.

Q "That's not cool. It's not a good idea." That's what you told them?

A Yes, sir. That's right.

Q And while you were down there in the station, there was a cop car that came by.

A A white cop car, yes, sir.

Q And again, it wasn't too cool, was it?

A No, sir.

Q Okay. I am talking about the first time you were down there.

A Yes, sir, I know it.

Q Although your statement says that there was a cop car or there was a white police car that came by, and you watched to see if he was going to come back, and then you robbed her; the first time you were down there, there was also a cop car that passed by, wasn't there?

A Yes, sir.

Q It wasn't cool, you thought about it and decided it wasn't a good idea.

A That's right.

Q And if Leroy had said, "Hey, why didn't you go and rob it?"

 You would have told him, "Jump in a lake, fool. It wasn't a good idea." Wouldn't you?

A Yes, sir.

Q So, you know you are not going to jump in a fire just because Leroy tells you to, are you?

A No, sir.

Q You're not stupid, is what I'm saying, are you?

A No, sir.

Q If he wants to rob that store down there with a cop driving around, he can do it. Right?

A That's right.

Q But you're not going to do it, are you?

A No, sir.

Q But later again you got to thinking about it or you all talked about it.

 And when you say Leroy wanted to go do it, of course, the fact that you went back down there, you wanted to go too, didn't you?

A Yes, sir.

Q So, you know, let's put Leroy where he really belongs.

 You know when this happened back in July?

A Yes, sir.

Q Willie Mack, I don't like Leroy. Okay? And he is your friend, though, isn't he?

A Yes, sir.

Q And I have got my own reasons and, of course, I don't hold it against you that he is your friend.

 But you do realize that back in July, he didn't run down here and tell on you, so it is not like he ran down here and turned you in for doing this, is it?

A No, sir.

Q And Wilt, he didn't run down here and tell on you.

A No, sir.

Q So, those people, they've been close to you. You know, in other words, they've been your friends, haven't they?

A Yes, sir.

Q And they tried to protect you by not telling on you and you not telling on them, too, because they were in trouble.

A Yes, sir.

Q So, they had two motives, they didn't want to tell on you and they didn't want to tell on themselves. Right?

A That's right.

Q But if, in fact, Leroy said, "I stayed in the car," he is telling the truth, isn't he?

A Yes, sir, he stayed in the car.

Q And if, in fact, Wilt said, "I didn't know anything about it. They didn't let me in on it." Is he telling the truth?

A Yes, sir.

Q Wilt never knew this was going to happen?

A No, sir.

Q And you have maintained that all along, haven't you?

A Yes, sir.

Q So, if they ended up doing just like you have done and told the exact truth, even if it comes to the point that—Leroy didn't say he saw you kill anybody, did he?

A No, sir.

Q He never did say that.

But if he said, "Yes, he told me about it," and Wilt says, "Yes, I saw it," they are telling the truth, aren't they?

A Yes, sir.

Q And that is what we have all asked you to do, and you are doing that, aren't you?

A Yes, sir.

Q So, you're not mad at Leroy or Wilt for what happened?

A No, sir.

Q It was all very bad, very bad for all three of you, wasn't it?

A Yes, sir.

Q And you're not blaming them for any of this, are you?

A No, sir.

Q They didn't make you do anything, did they?

A No, sir.

Q And what you did that night, you did it because you wanted to do it.

A Yes, sir.

Q So, whoever it is, whether it is in this courtroom or outside the courtroom, that tries to put the blame on Leroy or on Wilt, they are wrong, aren't they, Willie Mack?

A That's right.

Q Because we discussed this before as to why Wilt is not going to the pen and why Leroy is charged with what he is, and you agree that the greatest interest in this case is the interest in who killed this woman?

A That's right.

Q Who stabbed that woman?

And that is the person who is going to have to face the most severe penalty.

A Yes, sir.

Q Willie Mack, that is the way it should be, isn't it?

A What are you talking about?

Q The person who killed this woman, they are the ones that should face it and should be charged with it, aren't they?

A Yes, sir.

Q And Leroy or Wilt, they shouldn't be charged with killing this woman, should they?

A No, sir.

Q I'm not saying they should get off. I'm not saying that they should or shouldn't get off, but I am talking about charged for killing this woman.

A No, sir.

Q Because Leroy was never there.

A No, sir.

Q And you, yourself, said that he had no idea that you were going to kill that woman.

Did he have any idea?

A Who?

Q Leroy?

A No, sir.

Q He knew you were going to rob her.

Didn't he really talk in terms about buying something there, go in and buy something and when the register came open, grab the money and run?

A No, sir.

Q Had that been mostly the plan you all were going to do?

A I don't know. No, sir.

Q Okay. So, regardless of what happened to the money, who got some of the money and what have you,—of course, you said Leroy gave you the money back he got from you, you know, when Leon came up.

A That was my money.

Q It was your money, but he gave it back to you.

A Yes, sir.

Q You told everybody that, didn't you?

A Yes, sir.

Q That was your money and you got it in this robbery, didn't you?

A Yes, sir.

Q So, he gave it back to you and you don't have any argument with him there.

A No, sir.

Q So, as to what you did that night, are you blaming Leroy or Wilt for it?

A No, sir. I'm blaming myself.

Q You are blaming yourself?

A Yes, sir.

Q All right. What you had done that night, with the exception of the killing, that is something you had done before?

A What, kill somebody?

Q No. With the exception. That means besides the killing. Robbing. In other words, robbing, you had done that before, twice before.

A Yes, sir.

Q Twice with a gun and once with—twice with a gun before you had done it.

A Yes, sir.

Q This time you had a knife.

So, as to the statement given by Wilt—you know the statement he gave?

A Yes, sir.

Q You said it's true?

A Yes, sir.

Q Wilt is not going to lie on you, is he?

A No, sir. I told him to tell the truth.

Q You told Wilt to tell the truth?

A The first day I came to Court.

Q Now, when you say you never denied—when you say you have never denied killing Deborah Davenport, that is not quite right, is it?

A No, sir.

Q You know, in the statement you gave—no. Let's go back.

In the testimony of George Houston, you know?

A Yes, sir.

Q You know George?

A Yes, sir.

Q You know, if George—you know, you told George about this and he testified, didn't he?

A Yes, sir.

Q And he didn't lie either, did he?

A No, sir.

Q George is just not going to lie on you, is he?

A No, sir.

Q All the people that have come to that jail, George is there when no one else is, isn't he?

A That's right.

Q And you go over there on any visiting day and look out and see you and George visiting and laughing and cutting up.

A Yes, sir.

Q George loves Willie Mack Modden, don't he?

A Yes, sir.

Q Y'all were good friends.

So, when he says you told him something, you told him that, didn't you?

A Yes, sir.

Q But he said that you told him that you killed that girl because your uncle told you to. And that's wrong, isn't it?

Wilt didn't tell you to kill anybody, did he?

A No, sir.

Q But if he said that—of course, that is not unusual, Willie Mack. You were faced with George Houston that night, and just to walk up and say, "I killed somebody," they might think that is some kind of strange, and you that night just told him, for whatever reason—and the reason being is, "Well I don't want him to think it is just all my idea, and I told him because my uncle wanted me to."

What I am saying is, you haven't always been real truthful about the facts in this case, have you?

A Yes, I have.

Q Well, basically you have, but let's just take your statement, Willie Mack.

Your statement here where it says, oh, something to the effect, "She put the money in the sack and put it on the counter and I pushed her into a little room that was just behind the counter. She was still crying and said something about me not killing her. I think I shut the door behind her, but I really don't remember."

A Well, I lied.

Q Okay. And that is what I say. You haven't been totally truthful.

Willie Mack, look at me. When I tell you that you hadn't been totally truthful, don't get mad at me.

A I'm not.

Q Just go ahead and straighten it out now because that is what we are here for.

But when you said—when you said that, you did lie, didn't you?

A Yes, sir.

Q And if you told George that someone told you to kill her, you lied there, didn't you?

A I don't remember. If I did, I can't remember.

Q Okay.

A I might have. I don't know.

Q But no one did tell you to kill her?

A No, sir.

Q You killed her because you didn't want to leave any witnesses.

And further, of course, you realize that George didn't come up here. You weren't arrested until something like October the 15th. Is that right?

Or October the 11th?

A October the 11th.

Q October the 11th.

And even after you gave this statement—you are talking about the person that's looking around behind the building, you know.

A That's true.

Q Okay. That's true.

The lady you indicated, "I didn't kill that woman. That person probably came back and killed her."

Isn't that right?

A I might have said that.

Q Of course, Willie Mack, you again look at me like I am fussing at you. I'm not.

A Oh, no. No. No.

Q But you told us, "That man must have come back and killed her," but you didn't do it.

Because this is hard to admit that you did it, isn't it?

A Yes, sir.

Q And there was even a point in time— you remember Mr. T. who was supposed to have been with you at the Jif–E Mart robbery?

A Yes.

Q Or was with you at the Jif–E Mart robbery?

A Yes.

Q Was he there?

A Which one? The first one?

Q The first one.

A Yes, he was.

Q So, you say he was with you, and you still say that?

A Yes, sir.

Q Of course, Willie Mack, at one point in time you said that he killed Deborah Davenport, and he was there.

A I lied.

Q You lied on him, didn't you?

A Yes, sir.

Q But it is somebody to blame for it, isn't it?

A Yes, sir.

Q Because you have got serious problems, and you knew that when you told that. Isn't that correct?

A Yes, sir.

Q And anyway, Mr. T. was confronted about this. And it was taken seriously what you said, wasn't it?

A Yes, sir.

Q And I believe your story was something to the effect that, you know, you and Wilt and Leroy had planned this.

A Yes, sir.

Q And you got with Mr. T. and talked to him and he met you at the station, and they didn't know about it. Do you remember that?

A Yes, sir.

Q And then you said, "We robbed her and then Mr. T. killed her."

A Yes, sir.

Q And he stabbed her.

A Yes, sir.

Q And we got Mr. T., right?

A Yes, sir.

Q And you saw him and he saw you, and for a long period of time you still said, "Yes, you killed her. You did it, you know it and all that."

A Yes, sir.

Q That wasn't right.

A That's right.

Q And that was a lie.

A Yes, sir.

Q And, of course, at that time, like I say, you were laying the blame on someone else, weren't you?

A Yes, sir.

Q Now, you know it is not right to lay the blame on anyone else.

A That's right.

Q But you were laying the blame on someone who was a totally innocent person.

A Yes, sir.

Q And had nothing to do with that killing at all.

A Yes, sir.

Q But you're not doing that today?

A No, sir.

Q Willie Mack, while I am thinking about it, let's just clear up one thing, too.

You know, when the officer said he looked at you and he didn't see any blood on you, at the time the officer saw you that night, you know, Leon Price, the deputy, and Officer Hayes, you didn't have any blood on you then, did you?

A No, sir.

Q But you had changed shirts.

A Yes, sir.

Q You had changed shirts at Roach's house.

A Yes, sir.

Q And y'all had burned that shirt just like Wilt said, didn't you?

A I don't know whether I burned it or not. I think Roach burned it.

Q But the shirt was burned?

A Yes.

Q And so when—and why did you burn it?

A No evidence.

Q It had blood on it?

A Yes, sir.

Q So, you had to get rid of that and burn it?

A Yes, sir.

Q Of course, that is pretty smart thinking, isn't it, Willie Mack?

A Yes, sir.

Q That's pretty smart thinking?

A Yes, sir.

Q And it is logical because the officers saw you some two or three hours later, and they couldn't see that blood, could they?

A No, sir.

Q If you still had that same shirt on, what would have happened?

A I would have been arrested.

Q You would have been arrested.

And when they did talk to you that night, they asked you all about the robbery, didn't they?

A Yes, sir.

Q And you answered every question and convinced those officers, who had been working a long time in each one of their departments, you convinced them at that time, at least, to let you go, didn't you?

A Yes, sir.

Q You remember the questions they asked you?

I don't mean everything in detail, but do you remember what they questioned you about?

A Not really.

Q Okay. At least when they got through with you, they didn't put you in jail then, did they?

A No, sir.

Q Willie Mack, if you or anyone else says you were drinking or were drunk that night, that may be so, but as far as you having to stumble down the street and couldn't walk, you weren't that way, were you?

A No, sir.

Q You could walk and you could still do what you think you wanted to do, couldn't you?

A What are you talking—

Q Well, you could do things that you wanted to do, even though you had been drinking.

For instance, talking to them about that robbery and going ahead in the store and robbing Deborah Davenport. You were able to do that, weren't you?

A Yes, sir.

Q And you were able to think clearly enough to know when a cop is driving by, it is not a good time to do a robbery, is it?

A No, sir.

Q And you were able further to think clearly enough to know when someone is walking back and forth—

A Yes, sir.

Q that's not a good time, is it?

A No, sir.

Q Willie Mack, you know, at one point in time you said you—let's see. "She opened the register and gave me the money."

Do you remember that?

A Yes, sir.

Q And then, Willie Mack, she got some money somewhere else. Is that right?

A Yes, sir.

Q Of course, you said you did hit her, but you know the room in which she was hit and where she was? You know that room?

A Yes, sir.

Q There is a safe in there. Remember—

A Yes.

Q —you saying you tried to get her to open the safe?

A No. I lied.

Q You lied?

A Yes, sir.

Q But you remember saying you tried to get her to open the safe?

A Yes, sir.

Q So, if you said you tried to get her to open the safe, and that's a lie, why would you lie and say you tried to get her to open the safe and you didn't?

A I don't know, sir. I don't know.

Q Of course, you also said at one point in time you didn't remember stabbing her, didn't you?

A Yes, sir.

Q But you do, don't you?

A Yes, sir.

Q Can you remember her asking you like you have in your statement, asking you not to kill her?

A She didn't say that. I lied about that.

Q Willie Mack, you know, that is something—that is something pretty hard to admit.

A No. I'm serious.

Q Well, I know it. And I am serious, too.

I am real serious because here you have sworn to one statement— Of course, we know parts of it are lies, but then they have other people who testi-

fied, just like George. Remember George? George would never lie on you.

A I know.

Q And he said, "She asked me not to kill her because she had three kids."

George said you told him that, and George has no way of knowing how many kids that woman has, so if he told—if he said that, the only way George knew that was for you to tell him that. That is the only way he knew it, Willie Mack.

A Yes, sir.

Q So, you told George that she was begging you not to kill her because she had three kids, didn't you? You had to.

A Yes, sir. You're right.

Q Not only is he right, Willie Mack, but that's the truth, isn't it?

A Yes, sir.

Q And that is hard to admit, isn't it?

A Yes, sir.

Q So, Willie Mack, you are admitting it now, aren't you?

A Yes, sir.

Q That that woman that night was there on the floor begging you not to kill her.

A Yes, sir.

Q Because she had three kids.

A Yes, sir.

Q She was begging you not to stab her because she had three kids. Isn't that right?

A Yes, sir.

Q And you're not blaming now anyone. You're not blaming Leroy, you're not blaming Wilt because it is not their fault.

A No, sir.

Q But you are kneeling over that woman and you are just plunging the knife into her neck and into her throat and into her face, and she is begging you not to do it. She is telling you, "Please don't kill me. I have got three kids."

Isn't that right, Willie Mack?

A Yes, sir.

Q So, if George says she said that, she said that?

A Yes, sir.

Q And you know Linda is the same way. Linda has no way—Linda has no way of knowing how many children she has.

You went and talked to Linda that night, didn't you?

A Yes, sir.

Q Willie Mack, Linda asked you—she asked you, "Willie Mack, does it bother you that you killed that woman?"

And you said, "Why should it?"

Maybe you felt that way. Maybe you felt that way for whatever reason that night.

Of course, today, while you are sitting here in the chair with your suit on, you know, it is different from where you were out there that night, isn't it, because now it is you whose life is on the line, isn't it?

A Yes, sir.

Q And, in essence, you're in the same position. You're in the same position that woman is, aren't you?

A Yes, sir.

Q How long did she beg you?

A I don't know.

Q All right. Tell us exactly what she said to you.

Willie Mack, we need to know the truth because this case does not need to be decided on anything but the truth. I

want these twelve jurors to know exactly what was said. So, when she said what she did, and when you did what you did, I want them to know it.

We have talked about this before and you said you were going to tell the truth.

And just a few minutes ago, you remember when you started lying?

A Yes, sir.

Q That's not right, is it?

A No, sir.

Q Are you going to tell the truth now, Willie Mack?

A Yes, sir.

Q What did she say?

A "Please don't kill me."

Q How many times did she say that?

A About two or three times.

Q "Please don't kill me. Please don't kill me. Please don't kill me."

She say it like that?

A Yes, sir.

Q What else did she say?

A She had three kids.

Q All right. Tell me how she said that to you, Willie Mack.

A She looked at my face and said, "Please don't kill me. Please don't kill me. Please don't kill me. I got three kids, three little kids."

Q Sweet little kids?

A Three little kids.

Q Three little kids.

"Please don't kill me. I have got three little kids."

Willie Mack, you know something, you are getting closer to the truth, aren't you?

You know something else, when you told me you didn't ask her to open that safe, Willie Mack, that's not right. You were lying to me, weren't you?

You did ask her to open it, didn't you?

A Yes, I did.

Q You asked her to open that safe?

A Oh, that safe behind—

Q Yes.

A No, sir. I didn't lie about that.

Q Why did you tell us you did?

What I am saying is, do you know where the stab wounds were on her? Do you know that, Willie Mack?

A Yes, sir.

Q Look here, if you will, Willie Mack. I know it is hard, but I want you to explain something to this jury. You see this stab wound behind her ear?

A Yes, sir.

Q Isn't it true that you were trying to get her to open that safe?

A No, sir.

Q But you were stabbing her in the back of the head like that?

It has to be in the back of the head because they are not going to change, Willie Mack. They are there forever.

A I know it.

Q You stabbed her right in the back of the head, two deep stab wounds. Is that right?

A Yes, sir.

Q What were you trying to do when you did that, Willie Mack?

A Didn't leave no—I didn't want no witnesses.

Q You didn't want any witnesses.

Can you explain why you didn't just simply cut her throat instead of running

a knife over and over and over and over again?

A No, sir.

Q Willie Mack, you very deliberately did this, didn't you?

A Yes, sir.

Q Do you know what "deliberate" means?

A Something you intend to do.

Q You intended to do it. You did it on purpose. You had a purpose for doing it. The purpose for doing it was to leave no witnesses. Isn't that right?

A Yes, sir.

Q Even though you were drinking, you knew that, didn't you?

A Yes, sir.

Q Willie Mack, there is nothing in your past, nothing in your past that indicates that you would be good in the future. Do you realize that?

A Um-hum.

Q Willie Mack, why would you ever care what happens to Leroy and Wilt now? Why is it important to you?

A Well,—repeat that again.

Q Why is it important to you what happens to Wilt and Leroy?

A What happens?

Q Why does it matter to you? Why do you care what happens to them?

A Well, I feel that they are all right and they are my friends.

Q You feel like what?

A I thought they were my friends.

Q Willie Mack, they are your friends. How can they not be your friends?

 Willie Mack, neither of those men did this: Look here. Neither of them did that.

A I know.

Q Neither of them have ever done anything like that, have they?

A No, sir.

Q Do you honestly tell this jury that they should get what you get out of this?

 By your own sworn testimony and all of the evidence that the police officers have gathered, they had nothing to do with this stabbing.

A No, sir.

Q They shouldn't get what you should get, should they?

A Get what?

Q They shouldn't get the same punishment you should get?

A No, sir. Not Wilt. I feel like Leroy do.

Q You think Leroy should get the same thing you do?

A Yes, sir.

Q Leroy never went in that store.

 Look here. Leroy never did that, did he?

A True.

Q Why do you think he should get the same thing you do?

A Because he planned it.

 If it wasn't for him, I feel like I wouldn't have did it. I told him I couldn't do it with a knife.

Q Because he talked you back into it?

A Yes, sir.

Q You just got through testifying to the fact that you did that—you done robberies on your own.

A Yes, sir.

Q And you didn't have to do that one.

A No, sir.

Q And you could have walked off at anytime you wanted to.

A Yes, sir.

Q No one made you do it.

A No sir.

Q You testified you could not blame Leroy, didn't you?

A Yes, sir.

Q So now you are blaming Leroy. Right?

A In a way, yes, sir.

Q So now you're blaming him.

Are you doing that to take some of the blame off of you?

A Oh, no. No.

Q This isn't something that was done— y'all didn't drive up to the hospital and immediately run to the station, and immediately do this, did you?

A No, sir.

Q This is something that you had—that you had thought about for a long time.

A What do you mean?

Q Well, let me get the exhibits behind you there and show you something.

When Uncle Wilt said he came in and bought a package of gum,—when Wilt said he bought a package of gum, he wasn't lying, was he?

A No.

Q And we are looking up here at 1:39. 1:39, he bought the gum.

And you know, we are looking down there at 2:05, is when that woman opened that register the last time.

When she opened the register the last time, that's when you killed her, shortly thereafter, isn't it?

A I don't know. I think it was later than this, Mr. Goodwin.

Q You think it was later than this?

A Yes, sir.

Q Well, I know it is 2:05 because it is dated. It was right after two o'clock.

Because, you know the officer that you saw pass by—

A I don't know him.

Q I know you don't know him, but you remember seeing one?

A Yes.

Q We know what time he checked out at the courthouse or the jailhouse. We know what time he checked out at another point, so we know the times. The times are on the tape.

What I am saying is that there was some twenty-something minutes from the time Wilt got the gum before you did this.

A Yes, sir.

Q So, it is not like you just did it like that. (Snapping fingers), is it?

A No, sir.

Q During this time, you thought about it.

A Yes, sir.

Q You thought about what you were going to do, didn't you?

A Yes, sir, but I wasn't intending to kill her.

Q You wasn't going to kill her?

Well, when did you decide to do that?

A I don't know.

Q So, you already knew if you didn't leave any witnesses, she couldn't identify you, didn't you?

A Yes, sir.

Q And you already knew that a month before you wore a stocking and got identified, didn't you?

And you already knew that the best thing to do is not to leave any witnesses. Isn't that right?

A Yes, sir.

Q So, you already knew what you were going to do, didn't you?

A Yes, sir.

Q You knew before you ever went in that store what you were going to do, didn't you?

A Yes, sir.

Q You knew this before you ever went in that store.

A Yes, sir.

Q You went in that store back when Wilt bought the gum, didn't you?

A Yes, sir.

Q You knew then that you were going to kill that woman, didn't you?

A Yes, sir.

Q You knew when you blamed Mr. T. for this—

A Yes, sir.

Q you were blaming an innocent man, weren't you?

A Yes, sir.

Q Do you realize if he had been charged and convicted on your testimony or any other testimony, that wasn't true?

A Yes, sir.

Q That he could have gotten the death penalty.

A Yes, sir.

Q What that would have meant, not only did you kill Deborah Davenport, but you killed an innocent man, didn't you?

A Yes, sir.

Q Willie Mack, is that the same thing that you are trying to do to old Leroy, sticking the blame on somebody else?

A No, sir.

Q You certainly don't think he is as guilty as you are by stabbing her, do you?

A No, sir.

Q He can't be, can he?

You say some twenty minutes before when you walked in that store, you knew you were going to kill that woman?

A Yes, sir.

Q Let's back up before then.

When you decided to rob the place, did you know you were going to kill the woman?

A No, sir.

Q You didn't know it then?

A No, sir.

Q But you had already decided to do it when you walked in that store?

A Yes, sir.

Q Did she talk to you while you were standing around drinking coffee? She talked to you, didn't she?

A Yes, sir.

Q She was nice and friendly, wasn't she?

A Yes, sir.

Q And you were friendly to her for a while, weren't you?

A Yes, sir.

Q She talked to you and you talked to her.

What did you all talk about?

A I told her I didn't have enough change for no coffee and she said, "Okay."

Q Did she give you the coffee?

A Yes, sir.

Q Gave you a free cup of coffee?

A Yes, sir.

Q Did you stay in there and drink that coffee?

A For a while.

Q Okay. And while you were in there for a while, like you stated, she was friendly, wasn't she?

A Yes, sir.

Q What else did she do?

A Nothing.

Q What else did she say?

A That's all.

Q That's all.

Did you say anything else to her?

A No, sir.

Q All right. After you drank your coffee, what did you do?

A Went back to the car.

Q And then you came back from the car and came back into the station. Right? Is that right?

A I think, yes.

Q You know, parts of that statement you say aren't true. Wilt said you only went to the hospital one time, but you did walk around the hospital.

You walked around a lot that night, didn't you?

A Yes.

Q You walked all the way around that hospital?

A Yes, sir.

Q You were thinking about it then, weren't you?

A Sir?

Q You were thinking about what you were going to do then, weren't you?

A Yes. Whether I wanted to do it or not.

Q Okay. Of course, you had decided not to earlier because it wasn't cool.

A Yes.

Q But eventually you came back, you came back and you robbed and stabbed Deborah Davenport, the same woman that gave you a cup of coffee fifteen minutes earlier. Isn't that right?

A Yes, sir.

Q And you did it as she was begging you not to kill her because she had three kids.

A Yes, sir.

Q Did you feel bad while she was begging you not to kill her?

A Yes, sir.

Q If you felt bad, how come you would keep stabbing the knife into her?

A I don't know, sir.

Q You told Linda you didn't feel bad.

A I didn't tell Linda that.

Q Well, some of what they say is true and some of what they say is not true.

A Yes, sir.

Q Of course, a lot of what they say, you admitted is the truth, haven't you?

A Yes, sir.

Q Just like George. You said you didn't remember that.

You know, she was stabbed somewhere around seventeen or eighteen times, according to the pathologist.

You told George you stabbed her fifteen times, didn't you?

You were pretty close in counting that, weren't you?

A I didn't count them. I just guessed.

Q You know, you say this knife is the same knife you killed Deborah Davenport with.

A Yes, sir.

Q The one that is up there that Mr. Askins showed you.

A Yes, sir.

Q That is the knife?

A Yes, sir.

Q Really and truly, like you said a while ago, there is no one else to blame but you, is there?

A Yes, sir.

Q Who is to blame?

A Myself. Willie Mack Modden.

Q Willie Mack Modden is the one to blame, isn't he, Willie Mack?

A Yes, sir.

Q Your lawyers can holler about old Leroy and they can holler about Uncle Wilt, and they can holler about how you were raised, but you were raised good, weren't you?

A Yes, sir.

Q You really were.

A Yes, sir.

Q That lady that was up here this morning, she was nice?

A Yes, sir.

Q Rosalie, she is a nice person.

Her kids, they haven't gone to the pen, have they?

A No, sir.

Q There is just really nothing at all you can blame this on, is there?

A No, sir.

Q Willie Mack, do you remember being asked about this instance in jail?

A Yes, sir.

Q You even have been bad since you've been in jail, haven't you?

A Yes, sir.

Q You tried to dig out of the wall?

A Yes, sir.

Q You see this right here, Willie Mack?

A Yes, sir.

Q That is a vent blade, isn't it?

A Yes, sir.

Q It is sharpened, isn't it?

A Yes, sir.

Q Where did you sharpen that?

A On the floor.

Q On the floor?

You know, you said you were going to commit suicide with it.

A Yes, sir.

Q Willie Mack, that's not right, is it?

A No, sir.

Q Willie Mack, I'm not—you know, I am not trying to be ugly to you, and you know that, but you weren't going to kill yourself with it?

A Yes, I was.

Q Well, is it true, and tell me the truth—we are talking truthfully. Didn't you just here recently, oh, the last three weeks—do you know Christopher Parker?

A Yes, sir.

Q And you were in jail with him?

A Yes, sir.

Q You talked to him about escaping with him. You talked about that, hadn't you?

A Yes, sir.

Q You said you could get George's sister to visit Parker when they came to visit you.

A Yes, sir.

Q And you all could jump the jailer and you could jump the dispatcher, and you all could go down to Diboll. You told him that, didn't you?

A Yes, sir. He is the one that started off first.

Q Okay. Old Christopher Parker is the one to blame on this deal, isn't he?

A Yes, sir.

Q Did you ever talk to somebody in jail about taking somebody as a hostage?

A No, sir.

Q Of course, you thought a lot about getting out of that jail.

Do you remember Mr. Peavy? You told him you were going to come out over him, didn't you?

A Well, yes, sir. We just be bull corning.

Q Of course, Willie Mack, some people are probably going to take it serious when you tell them things like that.

But at any rate, you have made numerous discussions or had numerous discussions about getting out or jail or you tried to get out of jail. You even made a knife. So, even after Deborah Davenport, even after you killed her, you still do things you are not supposed to do, aren't you?

A Yes, sir.

Q And if you have done them for the last—well, you remember your mother talking about when you were six or seven years old, you had to get a harder whip—when you had to get a whipping, she graduated to a bigger switch, I believe she said.

A Yes, sir.

Q You did all those things, all those mean and ugly things right on up until the time you killed Deborah Davenport.

Willie Mack, you still do mean and ugly things, don't you?

A No, sir.

Q When you are talking about getting out of jail and you are talking about escaping and grabbing a jailer and a dispatcher, that's mean and ugly things, isn't it?

A Yes, sir.

Q People can get hurt that way, can't they?

A Yes, sir.

Q There is really no indication anywhere that you will ever change, is there?

A Yes, sir.

Q Well, it is certainly not from anything that you have done in the past, is it, Willie Mack?

A Yes, sir.

Q You say that when people push on you, you get mad and strike out?

A Yes, sir.

Q Of course, you get mad and strike out when they don't push on you, don't you?

A Sometimes.

MR. GOODWIN: Your Honor, I pass the witness.

MR. ASKINS: We have no further questions, Your Honor.